WESTLANDS WATER DISTRICT and San Benito County Water District, Plaintiffs,

v.

UNITED STATES of America, Department of Interior, Bureau of Reclamation; Kirk C. Rodgers, Acting Regional Director, Mid–Pacific Region, United States of America, Department of Interior, Bureau of Reclamation; Bruce Babbitt, Secretary of Interior; Defendants.

San Joaquin River Exchange Contractors Water Authority; Friant Power Authority, Defendants–in–Intervention.

Friant Water Users Authority; Orange Cove Irrigation District; Shafter–Wasco Irrigation District; and Terra Bella Irrigation District; Chowchilla Water District; Madera Irrigation District Defendants–in–Intervention.

No. CVF945217 OWWDLB.

United States District Court, E.D. California.

June 26, 2001.

Daniel J O'Hanlon, Kronick Moskovitz Tiedemann and Girard, Sacramento, CA, for Westlands Water Dist.

William Thomas Chisum, Kronick Moskovitz Tiedemann and Girard, Sacramento, CA, for San Benito County Water Dist.

Maria A. Iizuka, U.S. Dept. of Justice, Env. and Natural Resources Div., Sacramento, CA, for U.S., Dept. of Interior, Bureau of Reclamation, Bruce Babbitt, Gale Norton.

Michael Victor Sexton, Minasian Spruance Baber Meith Soares and Sexton, Oroville, CA, for San Joaquin River Exchange Contractors Water Authority, Friant Power Authority.

Gregory K Wilkinson, Best Best and Krieger, Riverside CA, for Friant Water Users Authority.

Benslow B Green, Green Green and Rigby, Madera, CA, for Chowchilla Water Dist., Madera Irrigation.

## MEMORANDUM DECISION AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

WANGER, District Judge.

Before the court are the parties' cross-motions for summary judgment, which seek to determine the relative rights to water from a federal reclamation project, under three separate contracts with the United States, executed: (1) with plaintiff Westlands Water District ("Westlands") in 1963 ("1963 Contract"); (2) with plaintiff San Benito County Water District ("San Benito") in 1978 ("1978 Contract"); and (3) with defendants-in-intervention San Joaquin River Exchange Contractors Water Authority and Friant Power Authority ("Exchange Contractors") in 1939, and amended in 1967 ("Exchange Contract"). *See* Doc. 243 (Exchange Contractors); Doc. 248 (defendants-in-intervention Friant water-users);[1] Doc 255 (plaintiffs); Doc. 259 (federal defendants). Oral argu-

---

1. This group includes the Friant Water Users Authority; the Orange Cove Irrigation District; the Shafter–Wasco Irrigation District; and the Terra Bella Irrigation District.

On January 24, 2000, the Madera Irrigation District and Chowchilla Water District intervenors joined the Friant intervenors' summary judgment motion. *See* Doc. 258.

ment was held, *see* Doc. 291, and all issues have been fully briefed and considered.

## INTRODUCTION

The Central Valley Project ("CVP") delivers water throughout the Central Valley of California that helps make it the most agriculturally-productive region in the world. It is the nation's largest federal reclamation project, with nine separate divisions. This dispute centers on CVP water delivered through the San Luis Unit, a subset unit within the West San Joaquin Division of the CVP. Westlands and San Benito (collectively "plaintiffs") contract for water service with the United States. Westlands has a 1963 water-service contract with the United States and San Benito has a 1978 water-service contract with the United States. Both are to be supplied water from the San Luis Unit, although San Benito is in a different division, the San Felipe.

This case arises from the United States Bureau of Reclamation's ("Bureau") mid-February 1994 announcement of CVP water allocations for the 1994–1995 water year ("WY94") (March 1, 1994, to February 28, 1995). *See* Doc. 1 ex. C at 1. Because a water shortage was forecasted, the Bureau reduced most CVP contractors' contractual water allocations. Plaintiffs were allocated thirty-five percent (35%) of their contracted water supply. Others who receive water from the CVP did not suffer similar reductions. The Exchange Contractors' 1939 agreement with the United States is for substitute water. They receive water from the San Luis Unit. In WY94, they were allocated seventy-five percent (75%) of their contracted water supply.[2] *See id.* The Bureau justified the disparity in percentage water allocations based on its interpretation of the

parties' contracts. *See id.* ("Agricultural contractor's forecasted amounts are less than others due to contract provisions which allow for larger reductions.").

Plaintiffs claim their contracts do not permit them to be subject to larger reductions in their CVP water allocations over any others who receive CVP water. *See* Doc. 1 at ¶ 16. They further suggest that in times of water shortage, the Bureau must allocate all CVP water supplies on a pro-rata basis among "all CVP contractors," including the Exchange Contractors. *See* Doc. 256 at 2:10–15. Alternatively, in times of shortage, they say at least all San Luis Unit water should be apportioned on a pro-rata basis among any who receive such water, including the Exchange Contractors. In either event, the Exchange Contractors' contractual water supply from the CVP would be reduced to the same quantity plaintiffs receive, *e.g.*, thirty-five percent (35%) of the annual allotment.

The federal defendants and all intervenors oppose these contract interpretations. Each party seeks summary judgment on interpretation of plaintiffs' and the Exchange Contractors' relative rights to San Luis Unit water.

## I. *LEGAL STANDARD*

"Summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *7–Up Bottling Co. of Jasper Inc. v. Varni Bros. Corp. (In re Citric Acid Litig.)*, 191 F.3d 1090, 1093 (9th Cir.1999) (quoting FED. R. CIV. P. 56(c) and citing

---

**2.** Later in the year, "[t]he Exchange Contractors received ... notice of full water supply from the Bureau on March 14, 1994." Doc. 28 at ¶ 4; *see also* Doc. 21 ex. 9 at 1 (03/14/94 letter showing 100% allocation to Exchange Contractors).

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A genuine issue of fact exists when the nonmoving party produces evidence on which a reasonable trier of fact could find in its favor, viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). The non-moving party cannot simply rest on its allegation(s) without any significant probative evidence that supports the complaint. *See U.A. Local 343 v. Nor–Cal Plumbing, Inc.,* 48 F.3d 1465, 1471 (9th Cir.1994) ("As the Supreme Court has explained, '[i]f the evidence is merely colorable or is not significantly probative summary judgment may be granted.'") (citing *Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. 2505).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

 The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995); *see also Van Westrienen v. Americontinental Collection Corp.,* 94 F.Supp.2d 1087, 1094 (D.Or.2000) ("when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required.") (citing *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.,* 818 F.2d 1466, 1470 (9th Cir.1987)). Nevertheless, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in its favor." *Murphy Exploration & Prod. Co. v. Oryx Energy Co.,* 101 F.3d 670, 673 (Fed.Cir.1996) (quoting *Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). At the summary judgment stage, a court may not weigh the evidence, *i.e.,* issue resolution, but rather simply searches for genuine factual issues. *See Abdul–Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996).[3]

---

3. Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under the standard articulated in Rule 56(e). *See Keenan v. Hall,* 83 F.3d 1083, 1090 n. 1 (9th Cir.1996); *Anheuser–Busch, Inc. v. Natural Beverage Distribs.,* 69 F.3d 337, 345 n. 4 (9th Cir.1995). Properly authenticated documents, including discovery documents, although such documents are not admissible in that form at trial, can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration. *See United States v. 1 Parcel of Real Property, Lot 4, Block 5 of Eaton Acres,* 904 F.2d 487, 491–92 (9th Cir.1990). Supporting and opposing affidavits must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. *See* Fed. R. Civ. P. 56(e); *Conner v. Sakai,* 15 F.3d 1463, 1470 (9th Cir.1993), *rev'd on other grounds sub nom., Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

## II. *PROCEDURAL HISTORY*

Plaintiffs filed this case March 4, 1994, to enjoin the Bureau's WY94 allocation of CVP water and to obtain "a declaration that the Bureau may not satisfy its obligations to the Exchange Contractors by providing preferential allocations to the Exchange Contractors over the allocations received by Westlands and San Benito." Doc. 1 at 11:27–12:2 (complaint).

Between March 18, and March 23, 1994, the Exchange Contractors, *see* Doc. 13, the Friant Power Authority ("FPA"),[4] *see* Doc. 14, Friant water-users,[5] *see* Doc. 16, and two irrigation districts, Madera Irrigation District and Chowchilla Water District, *see* Doc. 17, intervened. These intervenors receive water from different CVP areas.[6] All will be adversely impacted if plaintiffs prevail, and the Exchange Contractors are forced to exercise their pre-CVP rights to that water.

Plaintiffs' motion for preliminary injunction (Doc. 3) was denied. *See Westlands Water Dist. v. Patterson,* 864 F.Supp. 1536, 1551–52 (E.D.Cal.1994) (*"Westlands III "*). On December 23, 1994, plaintiffs moved to voluntarily dismiss this complaint without prejudice. *See* Doc. 93. On January 9, 1995, the federal defendants, Friant water-user intervenors, and the Exchange Contractors moved for summary judgment. *See* Doc. 99; Doc. 102; Doc. 110. On August 9, 1995, the motion for voluntary dismissal was denied and the motions for summary judgment granted. *See Westlands Water Dist. v. Patterson,* 900 F.Supp. 1304, 1312, 1324 (E.D.Cal. 1995) (*"Westlands IV "*) (Doc. 157). Plaintiffs appealed. *See* Doc. 160. The Ninth Circuit reversed the denial of plaintiffs' motion to dismiss without prejudice; vacated the summary judgment decision; and remanded the case "for a determination whether costs and attorney['s] fees should be imposed as a condition of the dismissal without prejudice and, if so, in what amount." *Westlands Water Dist. v. United States,* 100 F.3d 94, 98 (9th Cir. 1996) (*"Westlands V "*).

---

**4.** Defendant-in-intervention FPA is a public agency, formed "in order to finance, design, acquire, construct, and operate and maintain a federally licensed hydroelectric generating station located at Friant Dam." Doc. 31 at 2:8–10. The FPA is a Joint Powers Agency and a California state public agency formed and existing in accordance with CAL. GOVT. CODE § 6500 *et seq. See* Doc. 31 at 1:27–2:2. It consists of nine public agencies: Chowchilla Water District, Madera Irrigation District, Orange Cove Irrigation District, Lindsay–Strathmore Irrigation District, Lindmore Irrigation District, Terra Bella Irrigation District, Delano–Earlimart Irrigation District, and Southern San Joaquin Municipal Utility District. *See id.* at 2:4–7.

**5.** The Friant water-user defendants-in-intervention, Friant Water Users Authority ("FWUA"), Orange Cove Irrigation District ("OCID"), Shafter–Wasco Irrigation District ("SWID"), and Terra Bella Irrigation District ("TBID"), rely on water from the Friant Division of the CVP. *See* Appendix D.

The FWUA is a California joint powers agency consisting of 25 irrigation districts, responsible for operating and maintaining the Friant–Kern Canal. *See* Doc. 19 at ¶ A. All members of FWUA have contracts with the United States for delivery of CVP water through the Friant–Kern Canal. *See id.*

The OCID entered into a long-term (40–year) water service contract with the United States in 1949, which was renewed in 1989 for another forty-year term, to receive Class 1 water for irrigation purposes from Friant Dam and Millerton Lake. *See id.* at ¶ B.

The SWID entered into a long-term water service contract for forty years with the United States in 1955 to receive both Class 1 and Class 2 Water Service from the Friant Division. *See id.* at ¶ C.

The TBID entered into a long-term water service contract for forty years with the United States in 1950, which was renewed in 1991 for another forty years, for Class 1 water. *See id.* at ¶ D.

**6.** The San Luis Unit or the Friant Division.

A July 31, 1997, district court order conditioned voluntary dismissal on plaintiffs' paying $100,446.08 attorney's fees and costs to the intervenors. *See* Doc. 199 at 20–21 (citing *Lau v. Glendora Unified Sch. Dist.*, 792 F.2d 929, 931 (9th Cir. 1986)). On August 21, 1997, plaintiffs elected to: not pay the attorney's fees and costs; not dismiss; and instead, proceed on the merits. *See* Doc. 200.

The pro-rata apportionment claim raises three issues: (1) whether the 1963 Westlands and 1978 San Benito Contracts require water delivered to the Exchange Contractors from the CVP to be included within supplies to which the contractual formulas are applied to calculate plaintiffs' pro-rata shares; (2) whether any such pro-rata calculation, if required, violates the Bureau's statutory duty to operate the CVP as an integrated unit; and (3) what rights under California water law, if any, the parties have to CVP water, and whether the pro-rata distribution plaintiffs seek violates any such rights.

### III. *FACTUAL BACKGROUND*

"[W]ater can be either a liability or an asset." *Cent. Green Co. v. United States,* 531 U.S. 425, 121 S.Ct. 1005, 1009, 148 L.Ed.2d 919 (2001). "California has a serious water problem particularly in the Central Valley." *Ivanhoe Irrigation Dist. v. All Parties & Persons,* 53 Cal.2d 692, 3 Cal.Rptr. 317, 350 P.2d 69, 76 (1960). "California's Central Valley is an immense elongated bowl approximately four hundred miles in length and at its widest point approximately one hundred miles in width. It is bounded on the north by the Siskiyou Mountains, on the south by the Tehachapi Range, on the east by the Sierra Nevada and on the west by the Coast Range." *California v. Rank,* 293 F.2d 340, 342 (9th Cir.1961).

The history of California water development and distribution is a story of supply and demand. California's critical water problem is not a lack of water but uneven distribution of water resources. The state is endowed with flowing rivers, countless lakes and streams and abundant winter rains and snowfall. But while over 70 percent of the stream flow lies north of Sacramento, nearly 80 percent of the demand for water supplies originates in the southern regions of the state. And because of the semiarid climate, rainfall is at a seasonal low during the summer and fall when the demand for water is greatest; conversely, rainfall and runoff from the northern snowpacks occur in late winter and early spring when user demand is lower.

*United States v. State Water Res. Control Bd.,* 182 Cal.App.3d 82, 227 Cal.Rptr. 161, 166 (1986) (citing 1 ROGERS & NICHOLS, WATER FOR CALIFORNIA 20, 26–33, 43–46 (1967)). The Central Valley Project was created to attempt to solve this problem. *See id.*

### A. *The Central Valley Project ("CVP")*

"The CVP is the nation's largest federal reclamation project, spanning 'the length of California's Central Valley, from Shasta Dam, in the north, to the Friant–Kern Canal, in the south.'" *United States v. Westlands Water Dist.,* 134 F.Supp.2d 1111, 1116 (E.D.Cal.2001) ("*Westlands 2001*") (quoting *Firebaugh Canal Co. v. United States,* 203 F.3d 568, 570 (9th Cir. 2000)). The California Legislature conceived the CVP in 1933. *See State Water Res. Control Bd.,* 227 Cal.Rptr. at 166. "The Central Valley Project ([Cal.] Wat. Code, §§ 11100–11925) was approved by the [California] Legislature and state voters in the early '30's. As originally proposed it was to be financed with revenue bonds, with revenues to be generated by the sale of water and power." *Goodman v. County of Riverside,* 140 Cal.App.3d 900, 190 Cal.Rptr. 7, 14 n. 6 (1983). "Efforts in the 1930's to sell bonds to finance

the central valley project had been unsuccessful, partly because the state's general credit did not guarantee payment." *Antelope Valley–E. Kern Water Agency v. Local Agency Formation Comm'n of Los Angeles County,* 204 Cal.App.3d 990, 251 Cal. Rptr. 593, 594 n. 4 (1988) (citing *id.*).

As a result of these pervasive unfavorable economic conditions during the Great Depression, California turned to the federal government for assistance to finance and construct the CVP. *See S. Delta Water Agency v. United States,* 767 F.2d 531, 534 (9th Cir.1985). The federal government assumed the role of building and operating the CVP. Congress initially authorized funds for the CVP under Section 4 of Chapter 48 of the Emergency Relief Appropriations Act of 1935 (Work Relief Act).[7] *See id.* Congress re-authorized the CVP under the Rivers and Harbors Act of 1937,[8] *see id.,* and the Bureau was assigned the task of undertaking the construction and operation of the CVP, *see Dugan v. Rank,* 372 U.S. 609, 611, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

"The grand design of the [Central Valley] Project was to conserve and put to maximum beneficial use the waters of the Central Valley of California," *id.* at 612, 83 S.Ct. 999 (footnote omitted), which comprises approximately one-third of California's territory.

The Central Valley basin development envisions, in one sense, an integrated undertaking, but also an aggregate of many subsidiary projects, each of which is of first magnitude. It consists of thirty-eight major dams and reservoirs bordering the valley floor and scores of smaller ones in head waters. It contemplates twenty-eight hydropower generating stations. It includes hundreds of miles of main canals, thousands of miles of laterals and drains, electric transmis-

sion and feeder lines and substations, and a vast network of structures for the control and use of water on two million acres of land already irrigated, three million acres of land to be newly irrigated, 360,000 acres in the delta needing protection from intrusions of salt water, and for municipal and miscellaneous purposes including cities, towns, duck clubs and game refuges. These projects are not only widely separated geographically, many of them physically independent in operation, but they are authorized in separate acts from year to year and are to be constructed at different times over a considerable span of years.

*Cent. Green Co.,* 531 U.S. at ——, 121 S.Ct. at 1009 (quoting *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 733, 70 S.Ct. 955, 94 L.Ed. 1231 (1950) ("*Gerlach*")).

The contemporary CVP consists of nine distinct geographic areas, known as "divisions." *See* Doc. 292 at 5–7 (Central Valley Project: Operating Criteria and Plan, dated October, 1992) ("CVP–OCAP"). These are the: (1) Trinity; (2) Shasta; (3) Sacramento; (4) American River; (5) Delta; (6) Eastside; (7) San Felipe; (8) West San Joaquin; and (9) Friant Divisions. *See id.* at 1–25. Each division has various facilities, including dams, lakes, canals, powerplants, and reservoirs. *See id.* at 5–7. This case involves water from three of the CVP Divisions: the West San Joaquin; the Friant; and the San Felipe Divisions.

██ The West San Joaquin Division primarily consists of the San Luis Unit, discussed *infra. See id.* at 7; Appendix E. The Friant Division consists of the Friant Dam, Millerton Lake, the Friant–Kern Canal, the Madera Canal, and the John A. Franchi Diversion Dam. *See* Doc. 292 at 7; Central Valley Project–Friant Division, *at*

----

**7.** 49 Stat. 115 (Apr. 8, 1935).

**8.** 50 Stat. 844, 850 (Aug. 26, 1937).

http://dataweb.usbr.gov/html/friant.html (last modified May 05, 2001) (last visited May 09, 2001);[9] Appendix D. "The San Felipe Division includes Pacheco Tunnel and Santa Clara Tunnel, conveyance facilities, pumping plants, power transmission facilities, a regulating reservoir, and distribution facilities in Santa Clara and San Benito Counties. Deliveries to the San Felipe Division are made through the San Luis Reservoir." Doc. 292 at 9; *see also* Central Valley Project–San Felipe Division, *at* http://dataweb.usbr.gov/html/sanfelipe.html (last modified June 02, 2001) (last visited June 05, 2001); Appendix A.

**B. *Ownership of CVP Water Rights***

■ The original CVP plan called for the United States to obtain, by purchase or otherwise, rights (both appropriative and riparian)[10] from water-rights holders in strategic areas to facilitate CVP water distribution, to provide a reliable and stable water supply. *See Gerlach*, 339 U.S. at 725, 70 S.Ct. 955. Purchases began in 1939. *See Dugan*, 372 U.S. at 613–14, 83 S.Ct. 999. From 1938 through 1949, each of Interior's annual Bureau budgets, except three (fiscal years 1941, 1945, and 1946), contained a line-item for the purchase of water rights in every federal appropriations request. *See Gerlach*, 339 U.S. at 735 n. 9, 70 S.Ct. 955.

Not all CVP water rights were purchased. Interior obtained some water rights for the CVP through formal exchanges. "Prior to the construction of the [Friant] dam it was necessary for the Bureau to enter into water rights settlement contracts with downstream riparian water rights holders on the San Joaquin River." *Westlands Water Dist. v. United States*, 805 F.Supp. 1503, 1504 (E.D.Cal.1992) (*"Westlands I "*). For example, in 1939, the Exchange Contractors executed a contract with Interior (the "Exchange Contract") that conditionally allows Interior to exercise "their rights to San Joaquin [River] waters in exchange for the agreement of the Bureau to provide 'substitute water [to them].' " *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 669 (9th Cir.1993) (*"Westlands II "*). The Exchange Contract grants the United States the right, "either in whole or in part, [to] store, divert, dispose of and otherwise use, within and without the watershed of the aforementioned San Joaquin River," the waters of that river, over which the Exchange Contractors hold rights under California law. Doc. 246 ex. 21 at 387–88. The reserved right to exercise their San Joaquin River water rights is conditional: it lasts "so long as, *and only so long as,* the United States does deliver to the [Exchange Contractors] by means of the [Central Valley] Project or otherwise substitute water in conformity with this contract." *Id.* at 388 (emphasis added).

An examination of the government's CVP water rights as of 1939 and later is instructive:

[T]he fact the Bureau does not consume water is not synonymous with having no

---

**9.** Internet citations are appropriate for background information. *Accord Kyllo v. United States,* — U.S. —, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (citing Internet); *cf. United States v. Jackson,* 208 F.3d 633, 637–38 (7th Cir.2000); *St. Clair v. Johnny's Oyster & Shrimp, Inc.,* 76 F.Supp.2d 773, 773–74 (S.D.Tex.1999) (explaining shortcomings of Internet information).

**10.** California law recognizes both riparian and appropriative rights. "Riparian" water rights are those that a person whose land is bounded or traversed by a natural stream has to the use of the stream or water. *See* 62 CAL. JUR. 3D, Water § 65, at 101 (1981 & 2000 Supp.) (citing 78 AM. JUR. 2D, Waters § 260). "Appropriative" rights to the use of water are founded on the doctrine of prior appropriation, which is based on actual use of the water, as compared to ownership of the land through which the water travels. *See id.* at § 255.

substantial interest in the water. *The Bureau has appropriative water rights in the Central Valley Project.* The Bureau owns the CVP facilities, has operational control and responsibilities relating to flood control, water supply, power generation, and fish and wildlife mitigation. The Bureau *has substantial property rights in its water rights permits,* whereby the Bureau diverts, transports, and stores water. *County of San Joaquin v. State Water Res. Control Bd.,* 54 Cal.App.4th 1144, 63 Cal.Rptr.2d 277, 285 n. 12 (1997) (citing *State Water Res. Control Bd.,* 227 Cal. Rptr. at 161) (internal citation omitted) (emphasis added). "The Bureau operates the Central Valley Project under water rights permits from the California State Water Resources Control Board." *Id.* at 279. Once the Bureau assumed control of construction of the CVP, "the DWR [Department of Water Resources] assigned its applications to the ... Bureau. The CVP was actually completed and in operation before [water] permits were issued: the first permits were issued to the U.S. Bureau in 1958 (Decision 893), and the principal permits were issued in 1961 (Decision 990)." *State Water Res. Control Bd.,* 227 Cal.Rptr. at 172. "For their initial operations in the Sacramento Valley and the Delta, federal authorities acquired appropriative rights." *Id.* "The U.S. Bureau and the DWR hold a combined total of 34 permits for various units of the CVP and SWP to authorize diversion and use of the Delta's waters. These permits were issued by the Board and its predecessors over a period of years extending through 1970." *Id.* at 165.

"The United States ... by virtue of the Reclamation Act, stands in the position of an upstream appropriator for a beneficial use." *Gerlach,* 339 U.S. at 743–44, 70 S.Ct. 955. "For the most part, the CVP applications preceded those of the SWP, so that most appropriative water rights of the CVP have a higher priority than the rights of the SWP." *State Water Res. Control Bd.,* 227 Cal.Rptr. at 188 n. 25.

The Bureau obtained rights to all water within the CVP Divisions implicated in this case by California Water Rights Decisions D–893 (American River, dated March 18, 1958), *see* 1958 WL 5645; D–935 (San Joaquin River rights, dated June 2, 1959), *see* Doc. 21 ex. 10; D–990 (Sacramento River, Rock Slough, Old River, and Channels of the Sacramento–San Joaquin Delta, dated February 9, 1961), *see* Doc. 273 ex. 3; and D–1020 (Old River, dated June 30, 1961), *see id.* at ex. 5.

The United States has acquired, by exchange, purchase, exercise of eminent domain, and appropriation, riparian and appropriative rights to all the water within the CVP for administration as part of an integrated federal reclamation project. Access to CVP water is only by contract with the United States. *See, e.g.,* 43 U.S.C. § 511 (2001). As the owner of CVP water rights, the United States has contractual authority and administrative discretion over how it provides water service among the CVP's water and power-users, and how it fixes priorities among them.

### C. *The San Luis Unit and the Plaintiffs' Water Contracts*

Each of the CVP's nine divisions has at least one subset "unit," which itself is comprised of various facilities, *e.g.,* a dam and a power plant. This dispute centers on one unit of the West San Joaquin Division, the San Luis Unit, authorized by the San Luis Act of 1960,[11] to be built and operated

---

11. Pub.L. No. 86–488, 74 Stat. 156 (June 03, 1960). For more discussion of the San Luis Act, see, *e.g., Metro. Water Dist. of S. Cal. v.* *Marquardt,* 59 Cal.2d 159, 28 Cal.Rptr. 724, 379 P.2d 28, 45–47 (1963) (in bank).

jointly between the United States and the State of California. *See* Doc. 292 at 8 (CVP–OCAP). The San Luis Act "contemplated additional construction projects to provide CVP water to Santa Clara, San Benito, Santa Cruz and Monterey Counties." *Westlands II*, 10 F.3d at 669 (citing § 6 of the San Luis Act of 1960).

The San Luis Unit consists of: "the San Luis Dam [12] and the San Luis Reservoir, together with a number of smaller facilities." *Westlands II*, 10 F.3d at 669 (footnote added); [13] *see also* Appendix B. The San Luis Reservoir has very little natural inflow. *See* Doc. 292 at 64 (CVP–OCAP). The water supply for the San Luis Reservoir is secured almost entirely by pumping surplus water from elsewhere through the Delta–Mendota Canal. *See* Doc. 245 ex. 1 at 12 (page 200) ("*Comprehensive Report* ").[14] "The water supply for this project [is] largely obtained from winter and early spring flows into the Sacramento–San Joaquin Delta," *id.* at 11 (page 219), which is supplied with water from the Sacramento River, *see Dugan*, 372 U.S. at 612, 83 S.Ct. 999. "The 'principal purpose' of

the San Luis Unit is to furnish irrigation to land in Merced, Fresno, and Kings counties, California." *Westlands 2001*, 134 F.Supp.2d at 1116 (citing *Firebaugh Canal Co.*, 203 F.3d at 570).[15]

Plaintiff Westlands is the largest contractor for water from the San Luis Unit. *See id.* (citing *Firebaugh Canal Co.*, 203 F.3d at 570); Appendix F. Westlands' June 5, 1963, amended contract with the United States for water service runs through 2007. *See O'Neill v. United States*, 50 F.3d 677, 680 (9th Cir.1995); Doc. 246 ex. 20 (1963 Contract: contract no. 14–06–200–495–A).

Plaintiff San Benito's April 15, 1978, water-service contract is for forty years, through 2018, from the San Felipe Division. *See O'Neill*, 50 F.3d at 680; Doc. 246 ex. 19 at 1 (1978 Contract: contract no. 8–07–20–W0130). This division was created after the San Luis Unit, to serve Santa Clara, San Benito, Santa Cruz, and Monterey counties. *See O'Neill*, 50 F.3d at 680. All water for the San Felipe Division is delivered through the San Luis

12. "B.F. Sisk (San Luis) Dam is located on San Luis Creek extending from SE ¼, Sec. 9, T. 10S., R. 8E., to NW ¼, Sec. 26, T. 10S. R. 8E., at 37 041 N. latitude and 121 041 W. longitude on the west side of the San Joaquin Valley, 12 miles west of Los Banos, California. The basin area is 82.6 square miles (Drainage Basin Map) and elevations across the basin range from 544 feet at the dam to over 3,200 feet at the southwest corner of the basin. Mean annual precipitation varies from 10 to 20 inches over the basin." *B.F. Sisk (San Luis) Dam, California, at* http://dataweb.usbr.gov/dams/ca10183.htm (last modified May 08, 2001) (last visited May 09, 2001).

13. The facilities that comprise the San Luis Unit are: the B.F. Sisk San Luis Dam and San Luis Reservoir, Coalinga Canal, Dos Amigos Pumping Plant, Los Banos and Little Panoche Detention Dams and Reservoirs, O'Neill Dam and Forebay, O'Neill Pumping–Generating Plant, Pleasant Valley Pumping Plant, San Luis Canal, and William R. Gianel-

li Pumping–Generating Plant. *See* Doc. 292 at 7 (CVP–OCAP).

14. *A Comprehensive Departmental Report on the Development of the Water and Related Resources of the Central Valley Basin, and Comments from the State of California and Federal Agencies*, dated August, 1949, H.R. REP. No. 2682, 85th Cong., 2d Sess. 14 (1958).

15. The San Luis Unit was constructed to utilize "surplus" water not required to satisfy the rights of existing water-rights holders:

The operation of the federal San Luis Unit would conserve and regulate *surplus wintertime water now wasting into the Pacific Ocean* through the Golden Gate and make it usable, along with additional Central Valley Project Water from storage, in the water-deficient San Joaquin Valley to the south. H.R. REP. No. 399, 86th Cong., at 2 (2d Sess. 1960) (emphasis added).

Reservoir. *See* Doc. 292 at 9; Appendices A–B.

### D. *Operational History of the CVP*

The Exchange Contractors hold riparian and pre–1914 appropriative rights to waters from the San Joaquin River. *See* Doc. 28 at ¶ 1. The San Joaquin is one of the "two great rivers" around which the CVP is built; the other is the Sacramento. *See Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 281, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), *abrogated on other grounds, California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).[16] These rivers naturally meet in the Sacramento–San Joaquin Delta, where the water would flow into the Pacific Ocean.

"The Sacramento Valley, containing the Sacramento River, lies in the northern portion of the Central Valley, and the San Joaquin Valley, containing the San Joaquin River, lies in the southern portion." *County of San Joaquin*, 63 Cal.Rptr.2d at 279 (quoting *S. Delta Water Agency*, 767 F.2d at 534). The San Joaquin River "rises in the Sierra Nevada northeast of Fresno, runs westerly to Mendota and then northwesterly to the Sacramento–San Joaquin Delta where it joins the Sacramento River," *Dugan*, 372 U.S. at 612, 83 S.Ct. 999, and eventually flows into the Pacific Ocean. "The Sacramento River rises in the extreme north, runs southerly to the City of Sacramento and then on into San

Francisco Bay and the Pacific Ocean." *Id.* If left to run their natural courses, these two rivers form a water paradox: "The Sacramento River has a surplus of water because of heavier rainfall in the northern region [but has little available tillable soil.] The San Joaquin River, in contrast, does not supply sufficient water for the extensive amount of tillable soil in its valley." *County of San Joaquin*, 63 Cal.Rptr.2d at 279 (quoting *S. Delta Water Agency*, 767 F.2d at 534) (citing *id.*) (alteration added).

To accomplish the reclamation goals of the CVP, the courses of both rivers were changed through an "imaginative engineering feat." *Dugan*, 372 U.S. at 612, 83 S.Ct. 999. The waters of the San Joaquin River are diverted completely from their natural course. *See id.* This is accomplished by impounding San Joaquin River waters by a dam constructed at Friant, California (Friant Dam),[17] approximately 60 miles upstream from Mendota. *See id.*

Once San Joaquin River water reaches Friant Dam, it "is controlled by the United States government as part of the federal Central Valley Project and is not within the State Water Resources Development System." *People v. Shirokow*, 26 Cal.3d 301, 162 Cal.Rptr. 30, 605 P.2d 859, 862–63 (1980) (in bank). The Friant Dam "forces the entire flow of the San Joaquin into Millerton Lake." *Ivanhoe Irrigation Dist.*, 357 U.S. at 282, 78 S.Ct. 1174.

Absent the cooperation of the Exchange Contractors, this diversion would not be

---

**16.** Although *Ivanhoe Irrigation District*'s holding has been abrogated, courts continue to cite to it for the history of the CVP. *See, e.g., Peterson v. United States Dep't of Interior*, 899 F.2d 799, 804 (9th Cir.1990).

**17.** "Friant Dam, which impounds water from the San Joaquin River in Millerton Lake, was one of the initial CVP facilities constructed." *Westlands I*, 805 F.Supp. at 1504. Although the Friant Dam was completed in late 1947, the dual-diversion system did not become ful-

ly operational until mid–1953. *See Gustine Land & Cattle Co. v. United States*, 174 Ct.Cl. 556, ¶ 52, *available at* 1966 WL 8856 (Ct.Cl. 1966). The Friant–Kern Canal opened for partial operation on July 9, 1949, at which time more of the San Joaquin River water was diverted from its river-bed and into the Friant–Kern canal to irrigate new lands to the south towards Bakersfield. *See id.* The Delta–Mendota Canal opened on August 1, 1951, and was substantially in full operation by July 19, 1953. *See id.*

possible, because they hold riparian and pre–1914 appropriative rights to the San Joaquin River water south of Friant, that allowed the Bureau to convey water from Millerton Lake to flow north into the Madera Canal, which "extends about 37 miles in length and services the Madera [Irrigation] District," [18] *id.* at 282–83, 78 S.Ct. 1174, and south into the Friant–Kern Canal, which supplies water to "the vicinity of Bakersfield for use in those areas for irrigation and other public purposes," *Dugan*, 372 U.S. at 612, 83 S.Ct. 999. In return for the conditional non-exercise of their San Joaquin River water rights, the Exchange Contractors have received substitute water from the Sacramento River and Delta since 1951. The waters of the Sacramento River are diverted into the San Joaquin Valley to replenish the San Joaquin River bed "for the entire length of the San Joaquin below Friant Dam." *Id.* This is accomplished by pumping water (at the Tracy Pumping Plant) from the Sacramento–San Joaquin Delta into the Delta–Mendota Canal. *See id.* Water flows by gravity along this canal, located on the west side of the San Joaquin Valley, *see id.*, to the Mendota Pool approximately 120 miles south of the Delta, *see Ivanhoe Irri-*

*gation Dist.*, 357 U.S. at 282, 78 S.Ct. 1174, where it is discharged into the San Joaquin River bed, *see Dugan*, 372 U.S. at 612, 83 S.Ct. 999, "replac[ing] that diverted from the San Joaquin by the dam at Friant," *Ivanhoe Irrigation Dist.*, 357 U.S. at 282, 78 S.Ct. 1174.

Even with the dual diversion, the Sacramento River water does not replace all the water taken from the San Joaquin River: "This impoundment and diversion leaves a dry stretch of San Joaquin riverbed." *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1123 (9th Cir.1998). Because the river bed at the Friant Dam is approximately 240 feet higher than the river bed at Mendota, the Sacramento River water cannot replenish the dry San Joaquin River bed in the 60–mile area between Mendota and Friant Dam. *See Dugan*, 372 U.S. at 613, 83 S.Ct. 999.

The Friant Dam currently diverts all of the San Joaquin River water north of the location where the Exchange Contractors hold their water rights, and stores that water at Millerton Lake, located at the northern point of the Friant Division of the CVP.

The water is distributed for use either to the north (into Madera Canal), or to the south (into Friant–Kern Canal).

---

**18.** Madera Irrigation District was permitted to intervene in this case. *See* Doc. 17.

**FIGURE 3-12**
**CENTRAL VALLEY PROJECT FACILITIES,**
**REGULATED RIVERS, AND DIVISIONS**
TRINITY RIVER MAINSTEM FISHERY RESTORATION EIS/EIR

Figure 1

This diversion has altered the natural river flows formerly used by the Exchange Contractors. Figure 1 shows that plaintiffs and the Exchange Contractors receive water that primarily originates in the Sacramento River, which is delivered through the San Luis Unit of the West San Joaquin Division of the CVP. *See also* Appendix B.

Westlands disputes the Exchange Contractors' priority to CVP-delivered water from the Sacramento River, claiming that any riparian and pre–1914 appropriative rights to San Joaquin River water, condi-

tionally exchanged by the Exchange Contractors, have been extinguished and can have no effect in allocation of water, especially CVP water from the San Luis Unit, because it is from a different source, the Sacramento River.

## IV. THE PARTIES' ARGUMENTS

To support their contention that the Bureau must allocate all CVP (or at the minimum, all San Luis Unit) water on a pro-rata basis in times of water shortage, the plaintiffs advance three contentions: (1) the 1963 Contract applies to any party who receives CVP water (or at least CVP water from the San Luis Unit); (2) the 1963 Contract's pro-rata calculation includes any water delivered to the Exchange Contractors through the San Luis Unit, under the subsections defining "contractual commitments" and "available supply;" and (3) the Exchange Contractors are "customers" who are subject to the 1978 Contract's shortage provisions.

All defendants oppose these interpretations.[19] The federal defendants argue that the Exchange Contractors are not CVP water-service contractors, "because they hold senior water rights which the United States has agreed [it] is required to honor pursuant to California water law" in the Bureau's management of the CVP. Doc. 265 at 3:22–4:2; see also Doc. 244 at 11:14–17 ("Neither the history of the San Luis Unit, the language of Plaintiffs' contracts nor the course of dealing since the Unit was built establish any right to pro[-]rata apportionment of all CVP water on the part of the Plaintiffs.") (capitalization omitted); Doc. 249 at 10:23–25 ("Neither the

Bureau's course of dealing with regard to the San Luis Unit nor the Districts' water supply contracts establish any right to a pro[-]rata apportionment of all water pumped by the CVP from the Sacramento–San Joaquin Delta.").

## V. ANALYSIS

The United States holds all water rights to CVP water. To access CVP water, water-users such as plaintiffs must enter into water-service contracts with the United States. See 43 U.S.C. § 511 (2001).

Four independent, alternative, and severable grounds defeat plaintiffs' pro-rata allocation interpretations. First, under federal contract law, plaintiffs' interpretation ignores the plain language of, and applicable extrinsic evidence that aids interpretation of, the amended 1939, 1963, and 1978 Contracts. See infra Part VI. Second, assuming, arguendo, plaintiffs' contractual interpretation is correct, such pro-rata allocation frustrates the necessary balancing of water rights Interior undertakes each year to discharge its statutory duty to properly operate the CVP as an integrated unit. See infra Part VII.A. It also violates basic principles of equity that would elevate plaintiffs, later-in-time water contractors, who have contributed very little to the creation or operation of the CVP, to an equal priority with the Exchange Contractors, senior water rights holders, who own conditionally-reserved senior and pre-existing riparian and pre–1914 appropriative water rights on the San Joaquin River, which have been utilized to create and operate the CVP. See infra Part

**19.** Several defendants cite equitable reasons for not reading the contract in this manner. For example, the Friant water-user intervenors contend that pro-rata allocation of CVP water would "produce a reapportioning of the Exchange Contractors' deliveries from the Delta, which in turn would result in the Exchange Contractors seeking alternative sup-

plies from Friant." Doc. 20 at 3:25–28. The FPA contends pro-rata distribution of CVP water would result in a significant default on the bonds issued for the construction of the Friant facilities and eliminate its ability to "consider, evaluate and negotiate restructuring and/or refinancing of the existing debt." Id. at 3:13–17.

VII.B. Third, even if plaintiffs' contractual interpretation is correct, *and* the statutory mandate to operate the CVP as an integrated unit "would not be frustrated," "pro-rata distribution" applied to the Exchange Contractors violates the California priority water-right principle, first-in-time, first-in-right, in derogation of the Exchange Contractors' senior and vested federal contract rights to receive water from the Bureau. *See infra* Part VIII.B. Fourth, plaintiffs have no independent state-law water rights that entitled them to any priority over Interior or the Exchange Contractors. *See infra* Part VIII.C.

## VI. *DISCUSSION: LEGAL (CONTRACTUAL)*

Plaintiffs contend that Article 11(a) of the 1963 Contract and Article 7(b) of the 1978 Contract unambiguously require that in times of water shortage, the Bureau must allocate all CVP water pro-rata among all CVP contractors, or at least, must allocate all San Luis Unit water pro-rata among all who receive water from the San Luis Unit.[20]

### A. *Federal Contract Law Analysis*

 Federal law governs the interpretation of a contract if the United States is a party, especially federal reclamation contracts. *See Mohave Valley Irrigation & Drainage Dist. v. Norton,* 244 F.3d 1164, 1165 (9th Cir.2001) (citing cases); *see also Westlands 2001,* 134 F.Supp.2d at 1135 (applying federal law to interpret Westlands' 1963 water-service contract) (citing *Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1210

(9th Cir.1999) (citing *O'Neill,* 50 F.3d at 682)). For guidance, federal courts also follow general principles of contract interpretation. *See Westlands 2001,* 134 F.Supp.2d at 1135 (citing *Saavedra v. Donovan,* 700 F.2d 496, 498 (9th Cir.1983) (citing *United States v. Seckinger,* 397 U.S. 203, 209–11, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970))). "When interpreting contract language, courts start with the assumption that the parties have used the language in the way that reasonable persons ordinarily do." E. ALLAN FARNSWORTH, CONTRACTS § 7.11 (1990). "[C]ourts should attempt to construe contracts to avoid absurdity, and must reject interpretations which would make the contract unusual, extraordinary, harsh, unjust, or inequitable." *Blecher & Collins, P.C. v. N.W. Airlines, Inc.,* 858 F.Supp. 1442, 1459 (C.D.Cal.1994) (citing sources).

 The Uniform Commercial Code ("U.C.C.") is one source of federal common law used to interpret any contract to which the federal government is a party. *See O'Neill,* 50 F.3d at 684 (applying the U.C.C. to the disputed contracts). "[T]he backdrop of the legislative scheme that authorized" a government contract may also be examined to interpret that contract. *Peterson,* 899 F.2d at 807 (citing *Fed. Hous. Admin. v. Darlington, Inc.,* 358 U.S. 84, 87–88, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958)). Additional contract interpretation rules apply:

(1) the four corners of the contract must be read as a whole;

(2) preference is given to reasonable interpretations, favoring those that avoid internal conflict;

(3) under the U.C.C., extrinsic evidence, including usage of trade;[21] course of

---

**20.** In *Westlands II,* the Ninth Circuit rejected the argument that any or all of the Act, the Westlands 1963 Contract, or the San Benito 1978 Contract mandates preferential treatment of the San Luis Contractors. *See* 10 F.3d at 676. In dicta, it noted that plaintiffs "did not allege, even in the alternative, that

they are entitled to share Reservoir water with the Exchange contractors on an equal or pro rata basis." *Id.*

**21.** A usage of trade is:

any practice or method of dealing having such regularity of observance in a place, voca-

dealing;[22] and course of performance,[23] is admissible to determine whether the contract is ambiguous;

(4) if the contract is ambiguous, *i.e.*, whether "reasonable people could find its terms susceptible to more than one interpretation," extrinsic evidence may be considered to interpret the parties'

intent in light of earlier negotiations, later conduct, related agreements, and industry-wide custom;[24]

(5) whether a contract (or any term) is ambiguous is a question of law.[25]

*See Westlands 2001*, 134 F.Supp.2d at 1134–38 (quoting and citing cases).[26]

tion or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. U.C.C. § 1–205(2).

**22.** A course of dealing is:

a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. U.C.C. § 1–205(1).

**23.** "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." U.C.C. § 2–208.

**24.** Initially, plaintiffs took the position that because the express terms are unambiguous, it is not necessary for the Court to consider extrinsic evidence. *See* Doc. 256 at 10–11. In their reply, however, they now claim that the extrinsic evidence offered by the federal defendants and the defendants-in-intervention is not the type of extrinsic evidence allowed under *O'Neill*. *See* Doc. 282 at 11–14.

**25.** The Fifth Circuit applies a tripartite inquiry for ambiguity:

1. Were the express contract terms ambiguous?
2. If not, are they ambiguous after considering evidence of course of dealing, usage of trade, and course of performance?
3. If the express contract terms by themselves are ambiguous, or if the terms are ambiguous when course of dealing, usage of trade, and course of performance are considered (that is, if the answer to either of the first two questions is yes), what is the meaning of the contract in light of all extrinsic evidence?

*Bloom v. Hearst Entm't, Inc.*, 33 F.3d 518, 523 (5th Cir.1994) (quoting *Paragon Res., Inc. v. National Fuel Gas Distrib.*, 695 F.2d 991, 995 (5th Cir.1983)). The first part of the inquiry presents a question of law and the third part, a question of fact. *See id.* Neither *Paragon* nor *Bloom* resolves the "thorny" problem of whether the second part was a question of law or fact or mixed. *See id.*

**26.** Plaintiffs cite *Maffei v. Northern Insurance Co. of New York*, 12 F.3d 892, 898 (9th Cir. 1993), to support their assertion that "[i]f a contract is ambiguous, thereby requiring the use of extrinsic evidence, summary judgment is inappropriate." Doc. 256 at 8:3–4. This statement is technically correct, but possibly misleading.

According to *Maffei:*

Whether a contract provision is ambiguous is a question of law. If it is, ordinarily summary judgment is improper because differing views of the intent of parties will raise genuine issues of material fact.

*Maffei*, 12 F.3d at 898. Under this language, *Maffei* only holds that summary judgment is inappropriate where a court has already determined a contract provision is ambiguous. *See, e.g., Adair v. City of Kirkland*, 185 F.3d 1055, 1063 (9th Cir.1999) (holding summary judgment inappropriate because the contract was ambiguous) (citing *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir.1997) ("If we find a contract to be ambiguous, we 'ordinarily' are hesitant to grant summary judgment 'because differing views of the intent of parties will raise genuine issues of material fact.' ") (quoting *Maffei*, 12 F.3d at 898)). If the extrinsic evidence, *e.g.*, under the U.C.C., is merely used to determine *whether* the contract is ambiguous (as opposed *to interpret* ambiguous terms), summary judgment is not presumptively inappropriate, so long as a material dispute of fact does not exist regarding that extrinsic evidence.

B. *The 1939 (as amended) Exchange Contract*

"The transfer of water between contractors of the Bureau of Reclamation's Central Valley Project has been an integral part of CVP operations since its inception. The vast network of storage, pumping, and conveyance facilities has been used to transfer surface and ground water to increase CVP supplies, reduce costs, and *to improve the timing and efficiency of deliveries to CVP contractors.*" Morris Israel & Jay R. Lund, *Recent California Water Transfers: Implications for Water Management*, 35 NAT. RES. J. 1, 23 (1995) (emphasis added). No party disputes that the Exchange Contractors are "holders of pre–1914 and riparian water rights on the San Joaquin River." Doc. 28 at ¶ 1. This dispute is over what rights they hold, if any, with respect to CVP water the Bureau delivers to them from another source, such as from the San Luis Unit, supplied not by San Joaquin River water, where the Exchange Contractors own senior water rights, but from "surplus" Sacramento River water.

The Exchange Contract has language that impacts plaintiffs. The original Exchange Contract was executed July 27, 1939, and most recently was amended December 6, 1967. *See Westlands I*, 805 F.Supp. at 1504; Doc. 246 ex. 21 at 1 (1967 Second Amended Exchange Contract, no. I1r–1144).[27] The Exchange Contractors conditionally promise not to, and to allow Interior to, exercise their vested state-law riparian and pre–1914 appropriative rights to San Joaquin River water, in return for a promise they would be provided a permanent, substitute water supply. Article 4 of the Exchange Contract, "Conditional Permanent Substitution of Water Supply," authorizes the United

States to annually exercise the Exchange Contractors' San Joaquin River water rights, conditioned on a return supply of substitute water:

> The United States may hereafter, either in whole or in part, store, divert, dispose of and otherwise use, within and without the water-shed of the aforementioned San Joaquin River, the aforesaid reserved waters of said river for beneficial use by others than the [Exchange Contractors] so long as, *and only so long as, the United States does deliver to the [Exchange Contractors] by means of the [Central Valley] Project or otherwise substitute water* in conformity with this contract.

Doc. 246 ex. 21 at art. 4a (emphasis added). The Exchange Contract was executed in 1939, but the government did not begin to store and divert the San Joaquin River waters or to supply the Exchange Contractors with substitute Sacramento River or Delta waters until approximately July 16, 1951. *See id.* at 3; *see also Wolfsen*, 162 F.Supp. at 405.

Article 4a's express language *does not extinguish*, but instead, *expressly reserves*, the Exchange Contractors' riparian and pre–1914 appropriative rights to San Joaquin River water, subject to the express condition that the government may exercise the Exchange Contractors' rights only if substitute water is provided them. *See* Doc. 246 ex. 21 at art. 4a ("so long as, and only so long as").

Article 4b grants the Exchange Contractors a federal *contractual* right to receive San Joaquin River water during *temporary* interruptions of delivery of the substitute waters:

> Whenever the United States is temporarily unable for any reason or for any

---

**27.** This contract "supercedes and replaces" the original 1939 Exchange Contract and its amendments. Doc. 246 ex. 21 at art. 1.

cause to deliver to the [Exchange Contractors] substitute water from the Delta–Mendota Canal or other sources, *water will be delivered from the San Joaquin River* as follows:

(1) During this period, for the first 7 consecutive days, in the quantities and rates as specified in Article 8 of this contract;

(2) For the balance of this period, in quantities and rates as reserved in the Purchase Contract, except that the United States further agrees that if the resulting delivery of water would be less than seventy-two per centum (72%) of Schedule One in said Purchase Contract then the United States shall make up such quantities by releases of available storage from Millerton Lake, provided, however, that the United States shall in no event be required to draw the storage in Millerton Lake below Elevation 464.00 U.S.G.S. datum or to retain water in storage for such releases.

*Id.* at art. 4b (emphasis added). The Exchange Contractors' right to receive water from the San Joaquin River if delivery of substitute water is temporarily interrupted, does not impair their reserved state-law right to exercise their riparian and pre–1914 appropriative rights to San Joaquin River water.

If the government *permanently* fails to provide the Exchange Contractors with substitute water, Exchange Contract Article 4c requires the government to release the "reserved" San Joaquin River water (they continue to own) held at Friant Dam:

Whenever the United States is permanently unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water in conformity with this contract, *the [Exchange Contractors] shall receive the said reserved waters of the San Joaquin River as* specified in said Purchase Contract and the United States hereby agrees to release at all such times said reserved waters at Friant Dam.

*Id.* at art. 4c (emphasis added).

Article 16 mandates that the Exchange Contract:

shall never be construed as a conveyance, abandonment or waiver of any water right, or right to the use of water of the [Exchange Contractors], or as conferring any right whatsoever upon any person, firm or corporation not a party to this contract, or to affect or interfere in any manner with any right of the [Exchange Contractors] to the use of the waters of the San Joaquin River, its channels, sloughs and tributaries, except to and in favor of the United States to the extent herein specifically provided.

*Id.* at art. 16 (emphasis added). Article 16 confirms the mutual *intent* of the Exchange Contractors and the United States that the Exchange Contractors never gave up their pre–1939 state water rights, and the Exchange Contract "shall never" be construed as conferring any right on any non-contracting party (here plaintiffs) to "affect or interfere in any manner" with the Exchange Contractors' rights to use San Joaquin River water. The government has expressed its intent to assure the Exchange Contractors' priority to San Joaquin River water to prevent the type of challenge here; *i.e.*, that plaintiffs can impair the Exchange Contractors' federal contract priority to substitute water from the Bureau or their senior state San Joaquin River water rights. This unambiguous language preserves the Exchange Contractors' pre–1939 priority of San Joaquin River water rights. This conditional subordination of senior water rights is different from a conveyance, abandonment, or waiver of water rights, because the Exchange Contractors have an absolute right

to exercise their pre–1939 riparian and appropriative rights to San Joaquin River water, which they still own and have reserved the right to exercise, if substitute water is not provided.[28] Article 16 also establishes that plaintiffs have no basis to claim any San Joaquin River water, in derogation of the Exchange Contractors' riparian and pre–1914 appropriative water rights.

The Ninth Circuit considered an exchange contract in *Madera Irrigation District v. Hancock*, 985 F.2d 1397 (9th Cir. 1993), addressing the Madera Irrigation District's ("MID") 1939 contract for sale of land and San Joaquin River water rights to the United States and a later 1951 contract by which MID exchanged its lands and water rights "for a 'permanent' supply of water," *id.* at 1401. The Ninth Circuit held MID had a *"vested property right* to a permanent water supply based on express provisions of its contracts." *Id.* at 1402 (citing *Alpine Ridge Group v. Kemp*, 955 F.2d 1382, 1385–86 (9th Cir. 1992), *rev'd on other grounds, Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993)) (emphasis added).

Article 4a of the 1939 Exchange Contract contains an analogous term: "Conditional *Permanent* Substitution of Water Supply." Doc. 246 ex. 21 at art. 4a (emphasis added).[29] By analogy to *Madera Irrigation District*, the Exchange Contractors hold a vested property right to a conditional permanent water supply provided by the United States, *see* 985 F.2d at 1402, from the CVP or other source chosen by the Bureau in its discretion.

Although the source of substitute water is not exclusive, the Exchange Contract expressly reserves discretion to the United States to provide substitute water from "the Sacramento River, the Sacramento–San Joaquin Delta and other sources through the Delta–Mendota Canal of [the CVP] and by other means." Doc. 246 ex. 21 at 3. The Exchange Contract "anticipated that most if not all of the substitute water provided the [Exchange Contractors] will be delivered to them via the aforementioned Delta–Mendota Canal." *Id.* at art. 5a. This language provides notice that the Bureau contractually selected the Sacramento River, Delta, and Delta–Mendota Canal as the primary source of substitute water. This source is consistent with the reality that the Delta–Mendota Canal is the only conveyance facility to transport substitute water from the CVP to the Exchange Contractors that does not originate in the San Joaquin River.

The California Supreme Court interpreted the 1939 MID exchange contract in *Madera Irrigation District v. All Persons*, 47 Cal.2d 681, 306 P.2d 886 (1957):

> In May, 1939, the District entered into a contract with the United States whereby

---

28. The contract confirms the Exchange Contractors' riparian and pre–1914 appropriative rights to San Joaquin River water still exist. It requires the government to notify any subsequent contractors for San Joaquin River water (*i.e.,* Friant Division water contractors) that the Exchange Contractors still possess rights to water from that source. *See* Doc. 246 ex. 21 at art. 4d ("The United States further promises and agrees that with respect to any contract between it and third parties for the use of water of the San Joaquin River it either will notify said parties in writing, prior to the execution of such contract, of the rights reserved to the [Exchange Contractors] in this article, or will specifically provide for the recognition n[sic] of such rights in such contract.").

29. This Article heading is not significant in interpretation of the Exchange Contract; it specifies, the "article and subarticle headings of this contract are merely summary indications of their subject matter and are placed herein for ease of reference only. They are not to be regarded as part of this contract for purposes of the construction thereof." Doc. 246 ex. 21 at art. 16.

it transferred its dam site, gravel lands and applications to the United States for use in connection with the Central Valley Project. In exchange the District received $300,000 and *a permanent priority right to contract for an annual supply of water from the project.* Part A of the contract now under consideration is in partial recognition of that right. The contract in Part A provides for a designated water supply for the District from the Friant Dam and the Madera Canal for a period of forty years, commencing with the year in which the initial delivery date occurs. The United States agrees to furnish to the District, and the District agrees to accept and pay for the water supplied at rates whose maximum limits are fixed by the contract. Part B of the contract provides that, to the extent that funds may be available by appropriation, the United States will construct a distribution system to cost not exceeding $8,320,000.

*Id.* at 889 (emphasis added). The California Supreme Court characterized the MID's exchange contract as creating "permanent priority" water rights in the CVP.

By the 1939 Exchange Contract, the Exchange Contractors grant Interior a defeasible right to exercise their retained, senior San Joaquin River water rights in exchange for a conditional permanent supply of substitute water that can come from any source (including from outside the CVP) that the Bureau, in exercise of its reasonable discretion, selects; subject to Article 4a's and c's conditions that if substitute water is not provided by the United States, the Exchange Contractors have reserved the right to exercise and enforce their extant riparian and pre–1914 appropriative rights to San Joaquin River water. As the appropriator under state permits, Interior had authority to establish a vested federal contractual priority to Sacramento River and Delta water as the primary source of substitute water for the Exchange Contractors.

C. *Extrinsic Evidence*

▮▮▮▮▮▮ It is appropriate to consider extrinsic evidence of course of dealing to interpret underlying rights arising from federal contracts. *See O'Neill,* 50 F.3d at 684–85.[30] In a December 29, 1959, letter, H.P. Dugan, Director of Region 2 of the Bureau of Reclamation, wrote:

---

**30.** The Exchange Contractors contend the 1949 *A Comprehensive Report on the Development of the Water and Related Resources of the Central Valley Basin* ("Comprehensive Report"), *see* Doc. 245 ex. 1, and the 1955 *San Luis Unit Central Valley Project: Report on the Feasibility of Water Supply Development* ("Feasibility Report"), *see* Doc. 246 ex. 2, demonstrate that the San Luis Unit was intended to fulfill the needs of the Exchange Contractors *first and then* allow others to have water. They cite the following from the Comprehensive Report:

> The water supply for [the San Luis Unit] reservoir would be secured almost entirely by pumping through the Delta–Mendota canal at such times as the full capacity of that canal is ·not required *for initial Central Valley project needs.*

Doc. 245 ex. 1 at 220 (Comprehensive Report) (emphasis added). In effect, they argue that

the San Luis Unit was built for the purpose of storing water "for later use in the summer." Doc. 244 at 15:12–13 (citing Comprehensive Report at 219–20). The Exchange Contractors' restatement of purpose is not set forth in the Comprehensive Report itself:

> The San Luis–West Side project is proposed for initial development to: (1) provide a substitute irrigation water supply for 100,-000 acres of lands which are now exhausting their ground-water supply, and (2) provide water for 150,000 acres of presently dry lands which could be served from the contemplated San Luis–West Side canal.

Doc. 245 ex. 1 at 219 (Comprehensive Report).

The Exchange Contractors argue that the substitute waters were not only to come from the Delta, *see* Doc. 244 at 14:9–10, quoting the Feasibility Report:

I confirm to you that *it has been, is, and will continue to be the policy and practice of the United States* to utilize the water available to it or made available to it [from] ... the Sacramento River and its tributaries and the Sacramento–San Joaquin Delta *to first satisfy the requirements of the Exchange Contract and Schedule 2 of the Purchase Contract* so long as it is legally and reasonably physically possible for it to satisfy these requirements ....

Doc. 245 ex. 7 at 3 (emphasis and alterations added).

The water-districts, *e.g.*, MID, that received water from the Friant Division were concerned that addition of the San Luis Unit to the CVP, to provide water to Westlands and others, could reduce availability of Sacramento River and Delta water, which would require the Exchange Contractors to exercise their San Joaquin River water rights in future times of shortage, which in turn would reduce MID's available water:

This letter is written on behalf of the Madera Irrigation District, and is in response to your letter of December 29, 1959. That letter reiterated the long standing policy and practice of the United States *to utilize the water available to it or made available to it under its applications to appropriate from the Sacramento River and the Sacramento–San Joaquin Delta to first satisfy the*

*requirements of the Exchange Contract* ... so long as it is legally and reasonably physically possible for it to satisfy these requirements; provided that the United States has met and will not voluntarily impair the delivery of water required to satisfy these requirements.

This letter is in response also to the letter ... from the Regional Solicitor of the Department of the Interior respecting the proposal of the United States to enlarge and consolidate the service areas under all applications and permits of the United States for the [CVP].

The Madera Irrigation District agrees generally that the proposal to enlarge and consolidate all [CVP] service areas will permit a more flexible distribution of water to the areas of need, with a consequent even better benefit in most instances to the State of California from the [CVP]. However, as we have pointed out in various meetings and discussions in the past few months with you and representatives of your office and the Regional Solicitor's office, we are concerned that in times of water shortage the proposal could result in less Sacramento River and Delta water being available for the [Exchange Contractors], which is the foundation of our Friant water supply, than under the present service area arrangements.

*Id.* ex. 8 at 1–2 (letter dated February 1, 1960) (emphasis added).[31] To address this

---

Part of the irrigation water released from Trinity, Shasta, and Folsom reservoirs is used in the Sacramento Valley and part flows to the northern edge of the Sacramento–San Joaquin Delta. From there the Delta Cross–Channel conveys this released water, as supplemented by surpluses in the Delta, to the intake of the Tracy Pumping Plant at the southern edge of the Delta. The Tracy Pumping Plant lifts it into the Delta–Mendota Canal which conveys it to lands along the canal and to Mendota Pool. Doc. 246 ex. 2 at 67–68 (Feasibility Report). The Exchange Contractors view their substi-

tute water as an "initial Central Valley project need."

31. This letter was written on behalf of MID by its counsel, Adolf Moskovitz of then-Kronick & Moskovitz, the predecessor law firm of Kronick, Moskovitz, Tiedemann & Girard, which now represents Westlands in this case. It establishes plaintiffs had actual knowledge that Friant Division water-users foresaw the need to maintain the Bureau's ability to service the Friant Division, and sought written confirmation of the priority of the Exchange Contractors' vested water-right claims, recog-

risk, the water-districts requested their existing contracts be amended to cause the United States to do everything to ensure that the Exchange Contractors receive their full allocation of substitute water, to prevent them from exercising their San Joaquin River water rights to the detriment of those water-districts:

> The statement of policy in your letter of December 29, 1959, greatly clarifies this matter. But, as we stated in the meetings referred to above, we believe it is essential that this policy be made firm by incorporating it into amendments to our present water service contracts. Inasmuch as the policy is of long standing and has been expressed publicly on a number of occasions, it has been our assumption that the United States could have no objection to such amendments.
>
> Your assurance that our assumption is correct, and that such amendments will be prepared and submitted for adoption as soon as it can conveniently be done, will enable us to give the United States wholehearted and active support in any and all proceedings for the establishment of the consolidated and enlarged [CVP] service area.

*Id.* at 2. In response, several water-service contracts were amended. For example, On August 7, 1962, the Terra Bella Irrigation District's contract was amended to include the following section:

> the United States further agrees that it will not voluntarily and knowingly render itself unable to deliver to the parties entitled thereto from water that is available or that may become available to it from the Sacramento River and its tributaries or the Sacramento–San Joaquin Delta those quantities required to satisfy the obligations of the United States under said Exchange Contract.

*Id.* ex. 10 at 3 (contract no. I75r–2446); *see also* Doc. 273 ex. 14 at 25–26 (Exeter Irrigation Contract, no. I75r–2508R); Doc. 273 ex. 22 at 3 (Kern Canon Water District Contract, no. 14–06–200–924). Most of these confirmatory amendments to protect the Exchange Contractors' priority to Sacramento River and Delta water as the source of their substitute water *preceded* formation of plaintiffs' 1963 and 1978 Contracts. Plaintiffs' attorney, Mr. Moskovitz and his law firm, which continues to represent plaintiffs, effectuated these amendments with Interior. Plaintiffs knew that Interior by contract and performance vested the Exchange Contractors with a prior right to the Bureau's appropriated CVP water.

The 1961 California Water Rights Decision 990 ("D–990") approved some of the Bureau's CVP water rights under California law. *See* Doc. 273 ex. 3. It expressly included a section entitled "Protection of Existing Rights." *See id.* at 75. D–990 confirms that "the Bureau's representatives have consistently affirmed their policy to recognize and protect all water rights on the Sacramento River and in the Delta existing under State law at the time these applications were filed, including riparian, appropriative, and others." *Id.* This language applies to the Bureau's right, practiced for ten preceding years, to use such water rights to provide substitute water to the Exchange Contractors.

When discussing the rights of the Exchange Contractors during the debate over the 1992 CVPIA, United States Senator Malcolm Wallop of Wyoming stated "those rights are secured under State law and *are superior to any CVP right.*" 138 CONG. REC. S17658, S17660; 1992 WL 279403 (statement of Sen. Wallop) (Oct. 8, 1992)

nized by Interior's policy and operational practice that appropriated Sacramento River and Delta water as the primary source for

substitute water under the Exchange Contract.

(emphasis added). (Plaintiffs hold only a water-service contract for CVP water). He further emphasized the priority of the Exchange Contractors' rights to CVP water: "[d]uring the current drought, prior right and exchange right holders agreed to forgo certain deliveries in order to permit the Secretary to make deliveries to the wildlife refuges and to urban users. No reductions were imposed on them *since no reductions could be imposed so long as there was any water.*" *Id.* at S17661 (emphasis added).

The 1949 Comprehensive Report on future development of the CVP also addressed the impact of the proposed San Luis Unit on prior, existing water rights:

> Water rights for existing irrigation developments *are superior* to any which may accrue to new developments.

Doc. 245 ex. 1 at 104 (emphasis added). The Exchange Contractors claim that:

> [i]ncluded in the definition of "course of dealing" under U.C.C. § 1–205(1) is Westlands' letter of September 5, 1957, answering the Bureau's protest to Westlands' application with the State Water Rights Board (now the State Water Resources Control Board) for the appropriation of unappropriated water.

In response to the Bureau's objection to Westlands' 1954 application, number 15764, to the California State Water Rights Board to appropriate unappropriated water from a tributary of the San Joaquin River, Westlands wrote:

> The Applicant, Westlands Water District, does not intend by the permit . . . to cause injury to those having valid vested rights in and to the waters of Old River. The Applicant intends to take only that water which is *in excess of the water needed to supply the valid vested*

*rights under reasonable means of diversion and use.*

Doc. 246 ex. 32 at 1 (letter dated Sept. 5, 1957) (emphasis added).[32] "Old River" refers to a channel of the Sacramento–San Joaquin Delta, flowing from the San Joaquin River. *See* Doc. 273 ex. 5 at 1. Westlands, to induce the State to grant it a water appropriation permit, represented it would not claim water rights in derogation of the water needed to supply "valid vested rights," such as those held by the Exchange Contractors.

■ Interior's discretion to manage the CVP as an integrated whole makes reasonable the diversion and use of Sacramento River and Delta water through the San Luis Unit to satisfy vested, senior, contractual water rights held by the Exchange Contractors. The plaintiffs had full knowledge that the Bureau had, since the inception of the CVP, utilized Sacramento River and Delta water to provide substitute water to the Exchange Contractors. Plaintiffs are equitably estopped by their knowledge and conduct to claim otherwise in derogation of a long-standing course of dealing by which Interior has recognized the contractual priority of the Exchange Contractors' vested water rights to substitute water, which it has supplied from Sacramento River and Delta water. *See, e.g., Lehman v. United States,* 154 F.3d 1010, 1016–17 (9th Cir.1998) (listing elements of estoppel); *Omega Indus., Inc. v. Raffaele,* 894 F.Supp. 1425, 1433 (D.Nev. 1995) (stating that equitable estoppel "stands for the basic precepts of common honesty, clear fairness and good conscience.") (quoting *Aetna Cas. & Sur. Co. v. Jeppesen & Co.,* 440 F.Supp. 394, 403 (D.Nev.1977) (quoting cases)).

**32.** Westlands assigned this application to the Bureau on October 10, 1960. *See* Doc. 246 ex. 33 at 1–3. The State approved the application and issued the Bureau an appropriation permit on August 4, 1961. *See WRIMS—Database Inquiry,* at http://www.water-rights.ca.gov/program/wrims/ (last modified Nov. 20, 2000) (last visited June 08, 2001).

This substantial extrinsic evidence proves that the parties (the water-districts and the Bureau), by their conduct, recognized the priority of the Exchange Contractors' pre-CVP, vested, reserved water rights under the Exchange Contract, and the Bureau has operated the CVP accordingly for over forty years to supply substitute water to the Exchange Contractors from Sacramento River and Delta water, until water shortages forced this litigation. On the other hand, plaintiffs point to no extrinsic evidence concerning usage of trade, course of dealing, or performance that supports an interpretation of this clause to ignore the Exchange Contractors' vested senior water rights and relegate them to co-equal status with plaintiffs to receive CVP water.

Westlands' Article 11(a) does not direct how Interior should distribute water to others with whom Interior has contractual commitments to provide CVP water, particularly holders of senior vested rights. The plain language of the 1963 Contract only requires that, in times of shortage, Westlands receive its pro-rata share of San Luis Unit water, *inter sese,* with other water-service contractors who have specifically contracted for San Luis Unit water. Not for thirty years, until 1994, did Westlands attack the Exchange Contractors' CVP water rights and the Bureau's long-established course-of-dealing and operational practice in management of the CVP, to first supply Sacramento River and Delta CVP water to the Exchange Contractors as substitute water. Plaintiffs submit no evidence that they received any different share of San Luis Unit water in WY 1994 from other San Luis Unit contractors.

D. *The Shortage Provisions of West-lands' 1963 Contract: Article 11(a)*

"Interpretation begins with the contract's language which 'is to govern if the language is clear and explicit.'" *Thompson v. Enomoto,* 915 F.2d 1383, 1388 (9th Cir.1990) (quoting sources) (ellipsis omitted). Article 11(a) of Westlands' 1963 Contract provides:

There may occur at times during any year a shortage in the quantity of water available for furnishing to the District through and by means of the Project, but in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising from a shortage on account of errors in operation, drought, or any other causes. In any such year in which there *may occur a shortage from any cause,* the United States reserves the right to apportion the available water supply among the District and *others entitled under then existing contracts to receive water from the San Luis Unit* in accordance with conclusive determinations of the Contracting Officer as follows:

(i) *A determination shall be made of the total quantity of water agreed to be accepted* during the respective year *under all contracts* then in force for the *delivery of Central Valley Project water by the United States from the San Luis Unit,* the *quantity* so determined being hereinafter referred to as *contractual commitments;*

(ii) A determination shall be made of the *total quantity of water from the Central Valley Project which is available for meeting the contractual commitments,* the quantity so determined being hereinafter referred to as the *available supply;*

(iii) The total quantity of water agreed to be accepted by the District during the respective year, under Article 3 hereof, shall be divided by the contractual commitments, the quotient thus obtained being hereinafter referred to as the District's contractual entitlement;

(iv) The available supply shall be multiplied by the District's contractual entitlement and the result shall be the quantity of water required to be delivered by the United States to the District for the respective year, but in no even shall such amount exceed the total quantity of water agreed to be accepted by the District pursuant to Article 3 hereof.

Insofar as determined by the Contracting Officer to be practicable, the United States will, in the event a shortage appears probable, notify the District of such determinations in advance of the irrigation season.

Doc. 246 ex. 20 at 356–57; Doc. 273 ex. 15 at 19–20 (emphasis added).[33]

The federal defendants assert the United States must meet its prior contractual commitment to deliver substitute water to the Exchange Contractors, which constitutes "any cause" within Article 11(a)'s shortage provisions. The "apportionment" right invoked by Westlands applies only to "others entitled under then existing contracts to receive water from the San Luis Unit." The Exchange Contractors do not have a contract to receive water "from the San Luis Unit," which is not a source of supply designated in their amended 1939 Exchange Contract. *See supra* Part VI.B. The United States has contractual and administrative discretion to choose the Exchange Contract's source of supply for substitute water, from the CVP or elsewhere. The unambiguous language of the Exchange Contract (Articles 4a-c), leaves to the Bureau's good-faith discretion, the choice of source to supply such substitute water. The Exchange Contractors retain the right to enforce and exercise their senior, vested San Joaquin River water rights, if the Bureau does not deliver substitute water to them.

1. *Pro-rata formula applied in times of shortage*

Subsection (i) requires Interior to calculate the total of its contractual San Luis Unit water commitments—"contractual commitments." Subsection (ii) requires Interior to calculate how much water from the whole CVP is available for use to meet San Luis Unit water contracts—"available supply." Subsection (iii) yields, as a quotient, Westlands' percentage of the total San Luis Unit water contracts. Subsection (iv) states that Westlands is to receive its pro-rata share of the CVP water available to the San Luis Unit, *i.e.*, Westlands' portion of the *actual* San Luis Water pie, but not more than the quantity in acre-feet of water specified in its contract. Article 11(a)'s formula is:

$$WPR = \left( \frac{WW}{SLC} \right) \bullet (TAS)$$

where WW = total volume of Westlands' contracted San Luis Unit water; SLC = total San Luis Unit contractual commitments; TAS = total available supply of the entire CVP for meeting all Interior's contracts for water service from the San Luis Unit; and WPR = Westlands' pro-rata water in shortage years, capped at the stated contract amount.

---

**33.** Article 11(a) has already been the subject of one lawsuit. In 1992, plaintiffs filed suit claiming, *inter alia,* that in times of shortage, Article 11(a) entitled them to preferential access to waters from the San Luis Reservoir. *See Westlands II,* 10 F.3d at 670. The Ninth Circuit held that "the Westlands and San Benito contracts contain no such requirements." *Id.* at 676. It also held "[n]either the [San Luis] Act nor the Westlands contract prohibits the Bureau from using Reservoir water to meet its contractual obligations to the Exchange contractors." *Id.* at 676. In dicta, *Westlands II* noted that Plaintiffs "did not allege, even in the alternative, that they are entitled to share Reservoir water with the Exchange contractors on an equal or pro rata basis." *Id.*

Plaintiffs advance two contractual arguments based on Article 11(a): (1) that the 1963 Contract binds all CVP water contractors; and (2) the Exchange Contractors' water falls within the 1963 Contract's pro-rata formula in Article 11(a), both under (a)(i)'s "contractual commitments" and (a)(ii)'s "available supply."

2. *Argument 1: Westlands' 1963 Contract applies to all CVP water contractors*

Plaintiffs argue Article 11(a)'s contractual language requires the Bureau to "allocate Central Valley Project ... water supplies on a pro-rata basis in times of shortage." Doc. 256 at 2:5–8. The plain language of Article 11(a) provides no support for this interpretation.

Article 11(a) provides:

*the quantity of water required to be delivered by the United States to the District for the respective year, but in no event shall such amount exceed the total quantity of water agreed to be accepted by the District pursuant to Article 3 hereof.*

Doc. 246 ex. 20 at art. 11(a)(iv) (emphasis added). This unambiguous language in no way suggests that the formula should (or could) be applied to any party other than Westlands, whether in the San Luis Unit or the whole CVP; nor has any legal authority been provided to justify such an interpretation. Westlands' contractual pro-rata formula does not apply to other water-users who are non-signatory, non-parties to the 1963 Contract. Article 11(a) only governs the respective distribution rights and Interior's obligation to deliver CVP water *to Westlands* in times of shortage.

3. *Argument 2: The Exchange Contractors' water falls within Westlands' 1963 Contract's Pro–Rata Calculations*

Plaintiffs interpret the 1963 Contract to include within Article 11(a)(i) "contractual commitments" and Article 11(a)(ii) "available supply," any quantity of water from the San Luis Unit, provided in any year to the Exchange Contractors.

a. *Clause (a)(i): "Contractual Commitments"*

Plaintiffs argue that any water due the Exchange Contractors under the 1939 Exchange Contract is an Article 11(a)(i) "contractual commitment," because the Exchange Contractors' right to receive water delivered by the federal government arises from a contract; *i.e.,* the amended 1939 Exchange Contract. *See* Doc. 282 at 2:23–25 ("[C]ontractual commitments refers to the total quantity of water agreed to be accepted during the respective year under *all contracts* then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit.") (emphasis in original). The express language of Article 11(a)'s formula is limited to CVP water specifically contracted for water delivery, and agreed to be accepted, *from the San Luis Unit, i.e.,* by San Luis Unit water contractors, who are not parties to Westlands' 1963 Contract. The first step in Article 11(a)'s formula is to calculate all the "contractual commitments" for the "delivery of [CVP] water ... *from the San Luis Unit:* "

the total quantity of water agreed to be accepted during the respective year under all contracts then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit.

Doc. 246 ex. 20 at art. 11(a)(i). This language unambiguously limits the calculation to contractual commitments for water *from the San Luis Unit.* The phrase "all contracts then in force for the delivery of [CVP] water by the United States" is specifically qualified by the source: "from the San Luis Unit."

The Exchange Contractors have not specifically contracted for delivery of substitute water from the San Luis Unit, which did not exist in 1939, or even necessarily from the CVP—the substitute water can come from any source the Bureau determines. The Exchange Contract gives the Exchange Contractors the right to receive "by means of the [CVP] or otherwise[,] *substitute water*," which can come from any source that the Bureau selects, including outside the CVP. Doc. 246 ex. 21 art. 4a at 5. Because the Exchange Contractors did not contract "for the delivery of [CVP] water from ... the San Luis Unit," their substitute water is not included within Article 11(a)(i)'s "contractual commitments," even if the Bureau chooses to supply it from the San Luis Unit.

b. *Clause (a)(ii): "Available Supply"*

Plaintiffs argue: (1) "available supply" is not limited to water from the San Luis Unit, but includes the whole CVP; and (2) in any year the Bureau allocates CVP water to the Exchange Contractors from the San Luis Unit, such water should be included in the calculation of Article 11(a)(ii)'s "available supply," because the water is delivered through the San Luis Unit, and is "available" to meet their contracts for San Luis Unit water.

Article 11(a)(ii) references "the total quantity of water from the Central Valley Project," *not* the total quantity of water from *the San Luis Unit* of the Central Valley Project. This reference is made with respect to the CVP water "available for meeting the 'contractual commitments,'" which Article 11(a)(i) defines as "the total quantity of water agreed to be *accepted during the respective year under all contracts then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit.*" Doc. 246 ex. 20 at art. 11(a)(i) (emphasis added). If the parties intended to limit "available supply" to San Luis Unit water,

they knew how to so do, as they did when they defined "contractual commitments" in Article 11(a)(i). This omission is significant to interpretation of two clauses so closely-located and related within the same contract. *Accord* 11 RICHARD A. LORD, WILLISTON ON CONTRACTS §§ 32:3—32:7 (4th ed. 1999 & 2000 Supp.); JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 3.13, at 154–58 (4th ed.1998).

That CVP water from outside the San Luis Unit is within (a)(ii)'s "available supply" definition to meet contractual commitments to San Luis Unit water contractors does not mean that Interior must treat CVP water delivered as substitute water through the San Luis Unit, although not contractually committed to the Exchange Contractors from that Unit, as "available supply," or count such substitute water as available to satisfy plaintiffs' contracts. A court cannot, under the guise of construction, add words to a contract, which would impermissibly re-write that contract. *See, . e.g., McConnell v. Pickering Lumber Corp.*, 217 F.2d 44, 47 (9th Cir.1954) (citing cases). Although the plain language of Article 11(a)(ii) does not limit "available supply" for Westlands' 1963 Contract to San Luis Unit water, such "available supply" does not include the substitute water delivered to the Exchange Contractors by the Bureau in the exercise of its CVP management discretion. The Bureau has never treated this substitute water as "available" CVP water. Even if the substitute water originates from the Sacramento River and the Delta and is now delivered through the San Luis Unit and Delta–Mendota Canal, such substitute water was first committed to the Exchange Contractors in 1939, and delivered every year after 1951 for at least ten years before the San Luis Unit existed and before 1963, the earliest date either of plaintiffs contracted with the Bureau for water service. *Accord* Central Valley Project Im-

provement Act ("CVPIA") § 3406(b)(2), Pub.L. No. 102–575, 106 Stat. 4600, 4706 (Oct. 30, 1992) (requiring that water commitments under pre-existing contracts and requirements of law existing when the CVPIA took effect be satisfied before any subsequent water-service contracts).

The term "available supply" in Article 11(a)(ii) of the 1963 Contract is defined as "the total quantity of water from the [CVP] which is available for meeting [San Luis Unit] contractual commitments." *Id.* at art. 11(a)(ii). The contract does not specify by what formula Interior is to annually calculate the quantity of CVP water to be allocated to the entire San Luis Unit. Extrinsic evidence shows that the Bureau's historical practice and policy, followed for forty prior years, does not count any CVP water (including any from the San Luis Unit) used to satisfy the Exchange Contractors' pre-existing vested water rights as "available supply." This course of dealing establishes that any Sacramento River and Delta water from the San Luis Unit or other source, used in any year to satisfy the Bureau's obligation to supply substitute water to the Exchange Contractors, is not "available [CVP] supply."

c. *Clause (a)(iii): "Contractual Entitlement"*

No legitimate dispute can exist over the entitlement language of Article 11(a)(iii), which specifies that Westlands' contractual amount of water (1.1 MAF) is divided by the total San Luis Unit contractual commitments, yielding a quotient, which is Westlands' contractual entitlement, *i.e.*, its portion of the *contracted-for* San Luis Unit water pie.

Article 11(a) solely defines the calculus for Westlands' pro-rata share during times of CVP water shortage; it does not bind any other party. It cannot be construed to diminish the Exchange Contractors' senior, reserved San Joaquin River water

rights under state law, or under Articles 4 and 16 of the amended 1939 Exchange Contract, or their vested priority right to substitute water from the Sacramento River and Delta waters, or any other source, delivered through the San Luis Unit under the Bureau's long-established CVP operational practice and course of dealing. Plaintiffs' motion for summary judgment based on their interpretation of Article 11(a) is DENIED in every respect.

E. *The Shortage Provisions of San Benito's 1978 Contract: Article 7(b)*

 San Benito's 1978 Contract, Article 7(b), governing water-shortage and apportionment, provides:

In any year that the Contracting Officer determines there is a shortage in the quantity of *water available* to *customers* of the United States from the Project, the Contracting Officer will apportion *available water among the water users capable of receiving water from the same Project facilities by reducing deliveries to all such water users by the same percentage, unless he is prohibited by existing contracts,* Project authorizations, or he determines that some other method of apportionment is required to prevent undue hardship. In the event reduced deliveries within the Division are unnecessary, the water supplies for both M & I and agricultural use shall be reduced by the same percentage for each contractor.

Doc. 273 ex. 16 at 11–12 (emphasis added). The threshold inquiry is whether the Exchange Contractors are "water[-]users capable of receiving water from the same Project facilities." Next is whether the 1939 Exchange Contract is an existing contract that prohibits reducing deliveries to the Exchange Contractors, and whether the Bureau has used some other method of apportionment to avoid undue hardship.

The definition of CVP "customers," only applies to determine if there is a water shortage in any year. There is no dispute that whatever the Exchange Contractors' status, a water shortage existed in WY94 among San Luis Unit contractors, such as plaintiffs. It is also undisputed that plaintiffs are Project (CVP) water "customers" of the United States.

1. *Argument 3: the Exchange Contractors are governed by Article 7(b)'s shortage provisions*

 a. *"Customer"*

The parties argue over the definition of "customer" in Article 7(b). The Contract does not define "customer" in its "Definitions" section. *See id.* at 2–3. Plaintiffs contend that the Exchange Contractors are "customers," as "defined" by the 1978 Contract, and subject to apportionment under the 1978 Contract's Article 7(b) pro-rata provision. Plaintiffs argue that the Exchange Contractors "traded their riparian rights for a regular and constant supply of Project water from Reclamation which they regularly use and consume," and that this makes them "customers." Doc. 282 at 3:26–4:1 (plaintiffs' reply). This is factually inaccurate, because the Exchange Contractors' water is not required to be provided from the CVP or any specified source.

The federal defendants rejoin that the Exchange Contractors are not "customers," because under Reclamation law, "customer" has a statutory meaning, also recognized by a long-established course of dealing: one who purchases water or power from a Reclamation project for money. Doc. 265 at 6:9–11 (federal defendants' opposition). As authority, they cite: Section 485h(c) of the Reclamation Project Act of 1939;[34] *City of Anaheim v. Kleppe,* 590 F.2d 285, 287 (9th Cir.1978); *City of Santa Clara v. Andrus,* 572 F.2d 660, 664 (9th Cir.1978); and *Arizona Power Authority v. Morton,* 549 F.2d 1231, 1237 (9th Cir. 1977).

Section 485h(c) of the Reclamation Project Act defines a class of preference customers for contracts to "furnish water for municipal water supply or miscellaneous purposes" and to purchase "electric power or lease electric power privileges." 43 U.S.C. § 485h(c) (2000). As to "customer preferences," this section provides, *inter alia:*

> That in said sales or leases preference shall be given to municipalities and other public corporations or agencies; and also to cooperatives and other nonprofit organizations financed in whole or in part by loans made pursuant to the Rural Electrification Act of 1936 [7 U.S.C.A. § 901 et seq.].

*Id.* City of Anaheim, City of Santa Clara, and *Arizona Power Authority* all discuss the import of the customer preference clause on awarding contracts for electrical power. None defines "customer" or limits the term to "one purchasing water or power from a reclamation project for money."

The Exchange Contractors are not "customers" under any normally-understood definition of the word. Rather, they conditionally *exchanged* the right to exercise their riparian and pre–1914 appropriative rights to San Joaquin River water for a vested property right in a firm supply of substitute water. Their substitute water entitlement may be satisfied from another source, not only the CVP. In times of shortage, the Bureau (through its contracting officer), as part of its statutory responsibility to operate the CVP as a whole, integrated project, makes a discretionary water-management policy decision to choose the source and amount of substitute water. Regardless whether "the Ex-

---

34. 53 Stat. 1193 (Aug. 4, 1939).

change contractors are 'capable of receiving water from the same Project facilities' under Article 7(b) of the San Benito contract," *Westlands*, 10 F.3d at 676, they are not "customers."

b. *Other 7(b) terms*

■ The express, unambiguous language of Article 7(b) makes "water[-]users capable of receiving water from the same Project facilities" subject to apportionment:

> the Contracting Officer will apportion available water among the water[-]users capable of receiving water from the same Project facilities by reducing deliveries to all such water[-]users by the same percentage . . . .

Doc. 246 ex. 19 at art. 7(b). Two phrases dictate whether the Exchange Contractors fall within Article 7(b)'s apportionment provision: (1) "available water;" and (2) "water[-]users capable of receiving water from the same Project facilities."

The 1978 Contract does not define either of these phrases. It does, however, define "Project" as "the Central Valley Project, California, of the Bureau of Reclamation," *id.* at art. 1(b), and " '[d]ivision' shall mean the San Felipe Division of the Project," *id.* at art. 1(c). Although "same Project facilities" is not explicitly defined, "Division Facilities" [35] and "San Benito Facilities" [36] are. *See id.* at art. 1(d)-(e). All three terms include the common element "facilities," which are the means used "to deliver water."

Article 7(b)'s unambiguous language includes the Exchange Contractors as "water[-]users capable of receiving water from the same Project facilities." The Ex-

change Contractors receive water from the San Luis Reservoir. San Benito receives water that is released from the San Luis Reservoir. *See* Doc. 292 at 9. The San Luis Reservoir is a CVP, *i.e.*, "Project", water-storage and conveyance facility. The Exchange Contractors and San Benito are "water[-]users capable of receiving water from the same Project facilit[y]."

However, substitute water delivered to the Exchange Contractors is not "available water," because such water is a vested priority obligation the Bureau must satisfy without including it in CVP available supply. *See supra* Part VI.D.3.b. Article 7(b) only allows the Bureau to apportion "available water," not the Exchange Contractors' substitute water. Its apportionment clause does not impact the Exchange Contractors. However, even if, *arguendo*, the Exchange Contractors are water-users capable of receiving water from the same Project facilities, *and* "available water" includes the substitute water delivered to the Exchange Contractors, the inquiry continues.

2. *Article 7(b) Exceptions*

■ Specific exceptions exist to disable Article 7(b)'s requirement for pro-rata reduction of water deliveries. No pro-rata reduction can be required if it is prohibited by "existing contracts," "Project authorizations," or "some other method of apportionment [as determined by the Contracting Officer that] is required to prevent undue hardship." Doc. 273 ex. 16 at 11–12.

Under *Madera Irrigation District*, the amended 1939 Exchange Contract is an "existing contract" that created vested

---

**35.** " 'Division Facilities' shall mean main conveyance, pumping, regulating reservoirs, and other works including, *but not restricted to San Benito Facilities* constructed or acquired by the United States to deliver water to the

contractors within the Division." *Id.* at art. 1(d) (emphasis added).

**36.** " 'San Benito Facilities' shall mean the Division Facilities used to deliver water to [San Benito] exclusively."

property rights to substitute water in the Exchange Contractors, which must first be satisfied under Article 7(b) before any pro-rata reduction in San Luis Unit water distribution to plaintiffs. Under Exchange Contract Article 16, Article 7(b) of the 1978 Contract cannot be interpreted in favor of a later CVP contractor to impair the amended 1939 Exchange Contract.

A second exception to Article 7(b) operates to prevent "undue hardship." If substitute water is not provided the Exchange Contractors and forces them to exercise their reserved riparian and pre–1914 appropriative rights to San Joaquin River water, "undue hardship" will be imposed on the overall operation of the CVP, by abridging effective CVP operations of the Friant Division, which will interfere with a number of public uses of CVP water for energy, municipal, and related public purposes on the entire east side of the Central San Joaquin Valley. *See Westlands III,* 864 F.Supp. at 1549–52 (listing negative effects of the Exchange Contractors' exercise of their San Joaquin River water rights).

Both of Article 7(b)'s exemptions, to meet "existing contracts" and "to prevent undue hardship," bar imposing pro-rata distribution on the Exchange Contractors under the 1978 San Benito Contract. Plaintiffs' summary judgment motion based on interpretation of Article 7(b) is DENIED.

### F. *Result of Contract Interpretation*

The 1939 Exchange Contract commits the United States to provide substitute water to the Exchange Contractors from any source selected by Interior in its discretion, not necessarily from either the CVP or the San Luis Unit. Extrinsic evidence shows that the Sacramento River and Delta waters were identified as the primary source for substitute water, which is confirmed by engineering reality, *i.e.,*

the Delta–Mendota Canal is the only conveyance facility available to transport such water to the Exchange Contractors. Article 11's shortage provisions defeat Westlands' rights to water-service in the event of drought or for "any other cause." Meeting pre-existing, senior, vested water rights held by the Exchange Contractors is such an Article 11(a) "other cause," arising from Interior's exercise of reasonable administrative discretion in managing the CVP.

Plaintiffs were represented by highly-experienced and expert water lawyers with comprehensive knowledge of the entire history of the CVP when the 1963 Contract was negotiated with the United States (the Exchange Contract had been in existence for over 20 years, and CVP waters from the Sacramento River and Delta delivered to the Exchange Contractors since 1951). The contracting parties could have explicitly made the Exchange Contractors subject to pro-rata sharing with plaintiffs or any other contractor who received CVP water from the San Luis Unit of the CVP. They did not do so.

The 1963 and 1978 Contracts' water-shortage provisions do not bind any non-signatories who hold senior vested water rights. The Exchange Contract does not commit San Luis Unit water for the purposes of Article 11(a)(i). Any CVP water delivered to the Exchange Contractors is not within the ambit of Article 11(a)(ii)'s "available supply." Such water is not "available" to meet any Article 11(a)(i) commitment, because no San Luis Unit water is expressly committed to the Exchange Contractors from that specific source. Articles 4 and 16 of the Exchange Contract prevent such an interpretation. The Exchange Contractors' original substitute water from the Sacramento River and Delta waters could not be provided "from" a non-existent San Luis Unit. The Bureau has never treated substitute water as "San

Luis Unit water," even if it is delivered through the San Luis Unit. The Exchange Contractors' substitute water cannot be included when calculating Westlands' and San Benito's pro-rata shares under their respective contracts. All plaintiffs' motions for summary judgment are DENIED.

## VII. DISCUSSION: EQUITABLE EFFECT ON CVP OF IMPOSING PRO–RATA DISTRIBUTION REQUIREMENTS

■ Even if the language of the 1963 Westlands or 1978 San Benito Contracts could be construed to require that the Exchange Contractors' substitute water be included within the formulas to determine plaintiffs' pro-rata share of San Luis Unit water (thereby reducing the Exchange Contractor's allotment), such a reading: (1) directly conflicts with the statutory requirement to operate the CVP as an integrated whole; and (2) violates basic principles of equity by placing inferior water-right holders (plaintiffs) on a par with superior water-right holders (Exchange Contractors).

### A. *Effect on Integrated CVP Operation*

In WY94, the Bureau carefully balanced all the rights and needs of CVP water contractors, and established water allocations accordingly. To understand how plaintiffs' interpretation of their contracts frustrates this delicate balance and integrated operation of the CVP, the location of the Exchange Contractors' vested water rights and how that water is used within the CVP must be reviewed. *See supra* Part III.D.

The Exchange Contractors own riparian and pre–1914 appropriative rights to San Joaquin River water that they conditionally subordinated in exchange for the Bureau's promise to provide them substitute water. "Their substitution was part of the whole plan proposed by the Secretary of Interior and approved by the President and authorized by Congress." *Wolfsen,* 162 F.Supp. at 406. This is an express Congressional mandate. This San Joaquin River water was used to create and operate the Friant Division of the CVP. Requiring any substitute water, furnished by the United States to the Exchange Contractors through the San Luis Unit, to be included within the sum of Article 11(a)'s "contractual commitments" or "available supply" ignores the Exchange Contractors' historical and still-existing vested superior water rights to San Joaquin River water, which Articles 4a and 4c of the amended 1939 Exchange Contract specify they can exercise any time they are permanently deprived of their full supply of substitute water. It also ignores Congress' intent in creating the Friant Division, the historical operating regime of the CVP, and Interior's forty-year operation of the CVP and course of dealing to supply the Exchange Contractors substitute water from the Sacramento River and Delta waters through the San Luis Unit and Delta–Mendota Canal. If the plaintiffs' interpretation of their contracts prevailed, the Exchange Contractors would not receive their full contractual allotment of substitute water, which would trigger the Exchange Contractors' right to exercise their San Joaquin River water rights. However, this San Joaquin River–Friant Dam water is already fully-dedicated to use by the Friant Division and related water-users. Plaintiffs' interpretation would completely destroy the Bureau's delicate operating balance that must be maintained to effectively manage the entire CVP as an integrated water project.

For the CVP to successfully provide service to its many agricultural, municipal, and other water-users, the Bureau must, according to statute, operate it as an integrated unit. *See* Pub.L. No. 86–488, 74 Stat. 156 (1960) (San Luis Act); *accord Westlands II,* 10 F.3d at 671 ("Such a

provision ... would be inconsistent with *the mandate that the San Luis Unit be operated as an integral part of the whole CVP.*") (emphasis added). The addition of the San Luis Unit to the CVP was not an exception to the rule of integrated management of the CVP. Rather, the San Luis Unit was expressly "planned as an addition to the Central Valley Project to be *coordinated fully, both physically and financially, with the existing* and authorized features of the parent project." Doc. 246 ex. 2 at 18 (1955 feasibility report) (emphasis added). This was well-known to plaintiffs when they contracted for water in 1963 and 1978. *See* Doc. 293 at 3 (July 13, 1962, letter from H.P. Dugan to Westlands' board of directors).[37] Plaintiffs' contracts do not create special, preferential rights, in derogation of the overall integrated management of the CVP. Rather, they contain shortage provisions that abate the right of plaintiffs to receive CVP water "for any cause" in water-shortage years.

The destructive impact of plaintiffs' interpretation on Interior's operation of the CVP as an integrated whole is illustrated by what would occur if the Exchange Contractors are forced to exercise their extant riparian and pre–1914 appropriative rights to San Joaquin River water. Plaintiffs are not directly impacted, because the water they receive is "surplus" Sacramento River water, *see Dugan,* 372 U.S. at 612, 83 S.Ct. 999, delivered through the San Luis Unit, *see* Doc. 246 ex. 1 at 220 ("*Comprehensive Report*"). The Exchange Contractors' exercise of their rights to San Joaquin River water dammed at Friant, however, would

jeopardize significant operations of the CVP elsewhere, particularly within the Friant Division, which uses diverted San Joaquin River water. The Madera District, *see Ivanhoe Irrigation Dist.,* 357 U.S. at 283, 78 S.Ct. 1174, the Central East side of the San Joaquin Valley, and Bakersfield and its vicinity (Friant Division), *see Dugan,* 372 U.S. at 612, 83 S.Ct. 999, all rely on the diversion of San Joaquin River water at Friant Dam, which is made possible only by providing substitute waters to the Exchange Contractors. If the Exchange Contractors exercise their riparian or pre–1914 appropriative rights to such water, which they have the right to do under Articles 4 and 16 of the Exchange Contract, no water would be available for other contractors served by the Friant–Kern and Madera Canals.

Plaintiffs' interpretation of the 1963 Contract would destroy the careful, balanced approach to integrated project management, carried out by the Bureau each year for almost forty years. Plaintiffs point to no extrinsic evidence that shows a statutory directive to abrogate the Bureau's duty to operate the CVP as an integrated whole. Absent the Exchange Contractors' conditional promise not to exercise their riparian and pre–1914 appropriative rights to San Joaquin River water, the CVP could not have been built or operated as it was prior to 1963, and the so-called "surplus" water that first allowed the San Luis Unit to be built would not have been available.[38]

The Bureau has discretion to prioritize and re-prioritize releases and CVP water

---

**37.** "In order to maintain the flexibility required to regulate and distribute the water from the Central Valley Project it becomes necessary that *the facilities of the Federal San Luis Unit be operated as an integrated part of the Project.* To operate it in any other way would reduce its effectiveness to supplement the requirements of any given area and would cost more to operate.... For these reasons

the storage by [Westlands] of water in the San Luis Reservoir *or any other use of the facilities curtailing the benefits of integration* appears unfeasible."

**38.** Sections of the California Water Code also arguably support the determination that the Bureau has great discretion when fulfilling the mandate to operate the CVP as an inte-

allocations to re-balance the overall CVP. Plaintiffs do not here assert an Administrative Procedure Act challenge to the manner in which the Bureau exercised its CVP operating authority and discretion. *See* 5 U.S.C. § 704 (2001). Plaintiffs' argument that they have been disproportionately disadvantaged compared to the Exchange Contractors ignores that plaintiffs are not similarly-situated, factually, legally, or equitably.

## B. *Equity*

■ The Exchange Contractors contracted *in 1939* to conditionally allow the government to exercise their riparian and pre–1914 appropriative rights to San Joaquin River water in exchange for a grant from the United States of a permanent substitute water supply from the CVP or other source selected by the Bureau. Such exchange allowed creation of the contemporary CVP, from which many municipalities and other water-users (including plaintiffs) are supplied with water and electricity. By contrast, at most, plaintiffs contributed a *1954* then-unapproved application for appropriation of water from a tributary of the San Joaquin River, expressly made subject to existing vested water rights. As of the date of the application, the Exchange Contractors had received substitute CVP Sacramento River and Delta water, delivered through the Delta–Mendota Canal, for over three years, under a plan approved by the United States. *See* Doc. 246 ex. 21 at 3.

■ A federal court has the inherent power from the United States Constitution

grated unit. "The [State Water Resources B]oard has no power, jurisdiction, authority or control over the construction, operation or maintenance of the Central Valley Project or any part of it." CAL. WATER CODE § 8536 (West 2000). California recognizes the importance of the mandate to operate the CVP as an integrated unit: "The approval and adoption of the State Water Plan do not repeal any of the provisions of the Central Valley Project Act of 1933, and to the extent there may be any inconsistency or conflict, the provisions of Part 3 of this division shall prevail over the provisions of this part and of the State Water Plan." CAL. WATER CODE § 10002 (West 2000) (footnote omitted); *see also* CAL. WATER CODE § 10006 (West 2000) ("The provisions of this part do not repeal or modify any of the provisions of Part 3 of this division."). The legislative intent of the California Water Plan in relation to the CVP is:

The Legislature hereby finds and declares that agreements which provide for the transfer of water from the federal Central Valley Project to public entities supplying water for domestic or irrigation use offer potential benefits to California's hard-pressed farmers and to California's water-dependent urban areas. It is the intent of the Legislature that these contracts be entered into for the purposes of strengthening

California's economy, serving the public, and protecting the environment. The director shall continue to pursue negotiations with the United States Bureau of Reclamation to contract for the interim rights to stored water from the federal Central Valley Project for use in the State Water Resources Development System by state water supply contractors.

CAL. WATER CODE § 10008 (West 2000).

Part 3 of Division 6 of the California Water Code is entitled "Central Valley Project." It encompasses 11 chapters, each with multiple sub-articles, which together comprise many different statutory sections. *See* CAL. WATER CODE §§ 11100–925 (West 1992 & 2001 Supp.). Section 12931 of the California Water Code makes these provisions applicable to the CVP. *See id.* at § 12931 (West 1992 & 2001 Supp.) ("Any facilities heretofore or hereafter authorized as a part of the Central Valley Project or facilities which are acquired or constructed as a part of the State Water Resources Development System with funds made available hereunder shall be acquired, constructed, operated, and maintained pursuant to the provisions of the code governing the Central Valley Project, as said provisions may now or hereafter be amended. For the purposes of this chapter the Sacramento–San Joaquin Delta shall be deemed to be within the watershed of the Sacramento River.").

to prevent inequitable results. *See, e.g., Levander v. Prober (In re Levander),* 180 F.3d 1114, 1118 (9th Cir.1999) (" 'The inherent powers of federal courts are those that "are necessary to the exercise of all others.' " This inherent power, which is based on equity, not only springs forth from courts' traditional power 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases,' but also 'furthers the pursuit of achieving complete justice by enabling the court to suspend those judgments whose enforcement leads to inequitable results.' ") (quoting cases). To permit plaintiffs, who held no rights that were necessary to the creation of the CVP, to enjoy equal rights with the Exchange Contractors, whose senior state-law water rights were integral to the creation, and necessary for the current operation, of the CVP, violates basic principles of equity. Such an interpretation should be avoided, if possible.

Given the superiority of the Exchange Contractors' riparian and pre–1914 appropriative rights to San Joaquin River water and the extensive protections afforded these interests by California law, *see infra* Part VIII, it is inconceivable that the Exchange Contractors would have relinquished their vested San Joaquin River water rights in 1939 to facilitate construction of the original CVP to be later relegated to a "pro rata" water-share with late-comer CVP contractors, who did not as of that date hold any (comparable) water rights (Westlands and San Benito did not even exist); who contributed little to the CVP; and who seek to claim equal priority to Sacramento River and Delta waters, long-ago committed to the Exchange Contractors. There is no inequity to plaintiffs, who through representation by the same law firm, have had actual notice through the long history of the CVP's operation that provided Sacramento River and Delta water for the Exchange Contractors' substitute water. Before

1994, plaintiffs, in their dealings with the State Water agencies and the Bureau, recognized and acquiesced in the priority of this senior vested right to the Exchange Contractors' source of substitute water.

Plaintiffs' interpretation of their contracts frustrates Interior's statutory duty to operate the CVP as an integrated unit and violates basic principles of equity. Throughout the entire history of CVP operations, plaintiffs never advanced the assertion that their rights to CVP water were on a par with the Exchange Contractors. Their motion for summary judgment is DENIED.

## VIII. DISCUSSION: CALIFORNIA WATER LAW PRIORITIES

The parties' relative rights were analyzed under California law in *Westlands I.* See 805 F.Supp. at 1509 ("under California law, the Exchange Contractors are entitled to available water supplies ahead of junior appropriators."). In affirming the ruling that Article 11 prevents Westlands from asserting any absolute right to its full contract amount of CVP water, the Ninth Circuit recognized that California water-law priorities apply to CVP water contractors. *See Westlands II,* 10 F.3d at 675–76. In the seven years this litigation has been pending, plaintiffs have never advanced any state water-law right to CVP water that puts them on the same level of priority as the Exchange Contractors. The Bureau owns all the state-law rights to CVP water, which it uses to operate the CVP as an integrated unit. Parties who receive water from the CVP do not file appropriation permits with the California State Water Resources Control Board, as is normally required to perfect priority of the right to take water from a California water source, *see* CAL. WATER CODE § 1450 (West 2000). Rather, the Bureau holds California water permits to all CVP water it delivers, pursuant to contracts with wa-

ter-districts and other CVP contractors. *See* 43 U.S.C. § 511 (2001).

## A. California Water Law

In constructing the CVP, "Congress proceeded on the basis of full recognition of water rights having valid existence under state law." *Gerlach,* 339 U.S. at 734, 70 S.Ct. 955. "Congress directed the Secretary of the Interior to proceed in conformity with state laws, giving full recognition to every right vested under those laws," and, as the work on the CVP progressed, Congress and the water-users were advised that "existing water rights would be respected." *Id.* at 739, 70 S.Ct. 955 (footnotes omitted); *see also Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 959, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982) (the Reclamation Act of 1902 "mandates that questions of water rights that arise in relation to a federal project are to be determined in accordance with state law") (citing *California,* 438 U.S. at 645, 98 S.Ct. 2985).

■ The only exception to this rule is where there is a "clear congressional directive" to the contrary. *See, e.g., S. Delta Water Agency,* 767 F.2d at 538; *Westlands I,* 805 F.Supp. at 1509 ("Under Section 8 of the 1902 Reclamation Act, federal reclamation projects must be operated in accordance with state water law, when not inconsistent with congressional directives.") (citing *California,* 438 U.S. at 674, 98 S.Ct. 2985). The Ninth Circuit interprets the term "congressional directive" as "a preemptive federal statute." *Natural Res. Def. Council,* 146 F.3d at 1132 (citing *United States v. California,* 694 F.2d 1171,

1176–77 (9th Cir.1982)). "Reclamation projects are ... subject to state law, so long as that law is not inconsistent with federal law." *Concerned Irrigators v. Belle Fourche Irrigation Dist.,* 235 F.3d 1139, 1143 n. 3 (8th Cir.2001) (citing *California,* 438 U.S. at 670–79, 98 S.Ct. 2985; *S. Delta Water Agency,* 767 F.2d at 536–37). Here, no preemptive Congressional statute that benefits plaintiffs is alleged to control.[39] "[T]he San Luis Act requires, as does all federal reclamation law, that the Bureau respect California's appropriative water rights hierarchy." *Westlands I,* 805 F.Supp. at 1509.[40]

■ "To fully understand the California [water] law, one must know its involved background as developed in endless bitter litigation." Edward F. Treadwell, *Developing a New Philosophy of Water Rights,* 28 Cal. L. Rev. 572, 572 (1950) (citing Samuel C. Wiel, Water Rights in the Western States (3d ed.1911); Lucien Shaw, *The Development of the Law of Waters in the West,* 10 Cal. L. Rev. 443 (1922); *Tulare Irrigation Dist. v. Lindsay–Strathmore Irrigation Dist.,* 3 Cal.2d 489, 45 P.2d 972 (1935)). "California operates under a 'dual' or hybrid system of water rights which recognizes both doctrines of riparian rights and appropriation rights." *State Water Res. Control Bd.,* 227 Cal.Rptr. at 168 (citing *Shirokow,* 162 Cal. Rptr. 30, 605 P.2d at 864 (citing Wells A. Hutchins, The California Law of Water Rights 40, 55–67 (1956))).

### 1. Riparian Rights

" 'Riparian' is defined as pertaining to or situated on the bank of a river. And

---

**39.** An argument exists that the Exchange Contractors are benefitted by Congressional action. *See, e.g., Wolfsen,* 162 F.Supp. at 406 ("Their substitution was part of the whole plan proposed by the Secretary of Interior and approved by the President and authorized by Congress.").

**40.** *See also* Reclamation Act of 1902, Pub.L. No. 57–161, ch. 1093, § 1(a), 32 Stat. 388, former 43 U.S.C. §§ 371–616 (1902) ("In constructing, operating, and maintaining the San Luis Unit, the Secretary shall be governed by Federal reclamation laws.").

riparian rights are those which a person whose land is bounded or traversed by a natural stream has to the use of the stream or water." 62 CAL. JUR. 3D, Water § 65, at 101 (1981 & 2000 Supp.) (citing 78 AM. JUR. 2D, Waters § 260).[41] On the other hand, "[t]he appropriative right to the use of waters is generally founded on the doctrine of prior appropriation." *Id.* at § 255, at 280.[42] "It is not always the case that the use of water on a riparian parcel is an exercise of a riparian right. 'It is established in California that a person may be possessed of rights as to the use of the waters in a stream both because of the riparian character of the land owned by him and also as an appropriator.'" *Pleasant Valley Canal Co.*, 72 Cal.Rptr.2d at 22 (quoting *Rindge v. Crags Land Co.*, 56 Cal.App. 247, 205 P. 36, 38 (1922)).

 "The riparian doctrine confers upon the owner of land the right to divert the water flowing by [ ] land for use upon [that] land, without regard to the extent of such use or priority in time." *State Water Res. Control Bd.*, 227 Cal.Rptr. at 168 (citing *Miller & Lux v. Enter. Canal & Land Co.*, 169 Cal. 415, 147 P. 567 (1915)).

### 2. Appropriation Rights

 "The appropriation doctrine confers upon one who actually diverts and uses water the right to do so provided that the water is used for reasonable and beneficial uses and is surplus to that used by riparians or earlier appropriators." *Id.*

"By far, the largest share of water in this state is used under claims of appropriative water rights or as secondary customers of an appropriator under contracts for water deliveries." 1 SCOTT S. SLATER, CALIFORNIA WATER LAW AND POLICY ch. 2, at 2–7 (2000). Appropriators need not own land contiguous to the water course. *See State Water Res. Control Bd.*, 227 Cal.Rptr. at 168. Originally, appropriation rights were acquired only by the actual diversion and use of water. *See id.* This changed in 1914, when California enacted a statutory scheme as the exclusive method to acquire appropriation rights. *See id.* (citing *Shirokow*, 162 Cal.Rptr. 30, 605 P.2d at 864); *see also, e.g., Envtl. Def. Fund, Inc. v. Armstrong*, 352 F.Supp. 50, 58 (N.D.Cal. 1972) ("Under California law all water rights are conditional and thus any person wishing to appropriate public water must file an application for a permit from the California Water Resources Control Board.") (citing sources); CAL. WATER CODE § 1225 (West 2001).

This scheme begins with Section 1201 of the California Water Code. *See* CAL. WATER CODE § 1201 (West 2001).[43] To acquire an appropriative right to California water, one must submit an application to the State Water Resources Control Board. *See State Water Res. Control Bd.*, 227 Cal. Rptr. at 168–69. Before there can be a taking and use of a specified quantity of water and/or construction of necessary wa-

---

41. *See also* BLACK'S LAW DICTIONARY 1328 (7th ed.1999) (defining riparian as "[o]f, relating to, or located on the bank of a river or stream (or occasionally another body of water, such as a lake)").

42. Scholars trace the origin of California's water law of appropriation to *Irwin v. Phillips*, 5 Cal. 140 (1855). For a more extensive discussion of the history of California's water rights, see, *e.g., Pleasant Valley Canal Co. v. Borror*, 61 Cal.App.4th 742, 72 Cal.Rptr.2d 1, 7–9 (1998) (citing sources).

43. "All water flowing in any natural channel, excepting so far as it has been or is being applied to useful and beneficial purposes upon, or in so far as it is or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is hereby declared to be public water of the State and subject to appropriation in accordance with the provisions of this code."

ter works, the application for appropriative rights must be approved. *See id.* "Any application properly made gives to the applicant a priority of right as of the date of the application until such application is approved or rejected. Such priority continues only so long as the provisions of law and the rules and regulations of the board are followed by the applicant." CAL. WATER CODE § 1450 (West 2000). "The issuance of a permit continues in effect the priority of right as of the date of the application and gives the right to take and use the amount of water specified in the permit until the issuance of a license for the use of the water or until the permit is revoked." CAL. WATER CODE § 1455 (West 2000).

■ The United States is specifically authorized to hold permits for California water, *see* CAL. WATER CODE § 1252.5 (West 2000) ("All rights and privileges conferred by this part upon any person in relation to the appropriation of water are likewise conferred upon the United States, the State, and any entity or organization capable of holding an interest in real property in this State."), but cannot acquire appropriative water rights to California water without following the same requirements as any other person, *see United States v. Fallbrook Pub. Util. Dist.,* 347 F.2d 48, 55–56 (9th Cir.1965).

### 3. *Priorities*

■ In times of shortage, California water law establishes the following priorities:

(1) Riparians have first priority: "in times of shortage, riparians are entitled to fulfill their needs before appropriators are entitled to any use of the water." *State Water Res. Control Bd.,* 227 Cal.Rptr. at 168.

(2) Among riparians, in times of shortage, all riparians must reduce their usage proportionately because all ri-

parians on a stream system are vested with a common ownership. *See id.* (citing *Prather v. Hoberg,* 24 Cal.2d 549, 150 P.2d 405 (1944); 1 ROGERS & NICHOLS, WATER FOR CALIFORNIA 216–51 (1967); WELLS A. HUTCHINS, THE CALIFORNIA LAW OF WATER RIGHTS 40–41, 52–55, 218–30 (1956)).

(3) Only after the riparians have fulfilled their needs are appropriators entitled to any water. *See id.* (citing *Meridian, Ltd. v. City & County of San Francisco,* 13 Cal.2d 424, 90 P.2d 537, 547–48 (1939)).

(4) "[B]etween appropriators, the rule of priority is 'first in time, first in right.'" *Id.* (citing *Irwin,* 5 Cal. at 147). "The senior appropriator is entitled to fulfill his needs before a junior appropriator is entitled to use any water." *Id.* (citing 1 ROGERS & NICHOLS, WATER FOR CALIFORNIA 254–304; 472–80 (1967); WELLS A. HUTCHINS, THE CALIFORNIA LAW OF WATER RIGHTS 40–51 (1956)).

### B. *Analysis*

■ The Bureau holds rights to all the water in the CVP, as an appropriator under permits from the California State Water Resources Control Board, which it uses to operate the CVP as an integrated unit. *See, e.g.,* In the Matter of Application 5625 and 38 Other Applications of United States Bureau of Reclamation and California Department of Water Resources to Appropriate from the Sacramento–San Joaquin Delta Water Supply ("D–1379"), 1971 WL 15197, *1 (July 28, 1971) (listing major water decisions approving applications filed by the Bureau). The Exchange Contractors own, but do not currently exercise, riparian and pre–1914 appropriative rights to the San Joaquin River water dammed at Friant. *See supra* Part VI.B. They also own federal contract rights with

Interior to substitute water from an appropriator of Sacramento River or Delta water, under the amended 1939 Exchange Contract. *See* Doc. 246 ex. 21 at art. 4. Plaintiffs hold 1963 and 1978 *contractual* rights to San Luis Unit water from the Bureau, as secondary customers of an appropriator, which are expressly subject to diminution during times of shortage. *See* Doc. 245 ex. 19 at 11–12 (San Benito); Doc. 246 ex. 20 at art. 11(a) (Westlands).

■ Plaintiffs rely on *Westlands II* dicta as authority for their argument that the Exchange Contractors have no superior state water rights, claiming that the diversion of the San Joaquin River water at Friant Dam extinguished the Exchange Contractors' riparian and pre–1914 appropriative rights to that water source.[44] *See* Doc. 267 at 30:17–20 (plaintiffs' opposition) ("since this litigation does not involve diversion of water from the San Joaquin River, California water rights law does not provide a basis for giving the Exchange Contractors a priority and taking them outside the apportionment requirements of the Districts' contracts."). Without full briefing on an issue not essential to the issues before it for decision, the Ninth Circuit expressed skepticism as to *Westlands I*'s observation, *see* 805 F.Supp. at 1507, that the Exchange Contractors could hold senior water rights to CVP water from another source (*e.g.,* the San Luis Unit), *see Westlands II,* 10 F.3d at 675 ("Unlike the district court, we are not convinced that the Exchange contractors, prior appropriators of water from one river, have superior water rights (i.e.[,] vested

property rights) to water from a different source.").[45] Dicta on an issue not submitted for decision, gratuitously offered by the Appeals Court without the benefit of briefing, are not precedential, nor preclusive of the need to analyze the nature of the Exchange Contractors' rights. *Accord Westlands 2001,* 134 F.Supp.2d at 1132–34 (pronouncements on an issue not necessary to prior 1990 decision were dicta, requiring *de novo* interpretation in the district court) (citing cases).

Plaintiffs also argue that any riparian rights to San Joaquin River water that the Exchange Contractors held are "now extinguished," because riparian rights extend only to landowners bordering a watercourse, and as a result of the CVP's diversion of the San Joaquin River at Friant Dam under the rights granted by the Exchange Contract, the Exchange Contractors no longer hold land that borders a "natural" watercourse. *See* Doc. 287 at 29:5–14. *Rank v. Krug,* 142 F.Supp. 1 (S.D.Cal.1956), facially supports this conclusion.

> [W]hen a change in the point of diversion of water is made, or attempted to be made, to land other than that to which the riparian right formerly attached, then *the law governing the right to divert is the law relating to appropriation of water, and not the law relating to riparian rights.*

*Id.* at 119 (emphasis added), *aff'd in part & rev'd in part sub. nom, California,* 293 F.2d at 340, *aff'd in part sub. nom, City of Fresno v. California,* 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963), *aff'd in*

---

44. Plaintiffs misstate that this issue was "definitively resolved" by *Westlands II.* The appeals court expressly declined to finally decide whether the Exchange Contractors' water is to be considered a "contractual commitment" as described in Article 11. *See Westlands II,* 10 F.3d at 675 ("We need not resolve this issue of California water law.").

45. These dicta appear to be based on a suggestion that because water trapped within the San Luis Unit would otherwise run into the Pacific Ocean, California water-law analysis of distribution is inapplicable. *See Westlands II,* 10 F.3d at 675.

*part, reversed in part, Dugan,* 372 U.S. at 609, 83 S.Ct. 999. Plaintiffs cite the Bureau's March, 1971, "Report on rights of J.W. Wilson to San Joaquin and Kings River Water in Fresno Slough," where the Bureau acknowledges that "[i]n California riparian rights do not apply to foreign water." Doc. 273 ex. 34 at 2.

The federal defendants cite *Wolfsen v. United States,* 142 Ct.Cl. 383, 162 F.Supp. 403 (1958), where the claimants contended:

> their riparian rights depended on San Joaquin water; that the substitution of exchange waters extinguished their riparian rights; and that without such rights, the potential use of their lands was reduced from wet (irrigated farming) to dry (native pasture), with consequent loss of value.

*Id.* at 405. The *Wolfsen* defendants rejoined that:

> they had riparian rights as long as the water came from the San Joaquin River, water from the Sacramento River was foreign water; and under California law, they say, he who discharges foreign waters into a stream may take them away with impunity.

*Id.* at 406. The Court of Claims held:

> In the absence of a specific ruling by a California court, *we cannot accept the application of the foreign water doctrine to the exchange waters of the Sacramento flowing down the channels of the San Joaquin from Mendota pool.* These waters of the Sacramento were substituted in consideration of the diversion of the San Joaquin waters. Their substitution was a part of the whole plan proposed by the Secretary of Interior and approved by the President and authorized by Congress. The diversion of San Joaquin waters was authorized only because of the commitment to substitute water from the Sacramento River. We do not

believe that the United States could, with impunity, take away the substituted waters.

*Id.* (emphasis added). Federal defendants do not address *Krug,* and plaintiffs do not address *Wolfsen.*

The Exchange Contractors never transferred their riparian and pre–1914 appropriative rights to San Joaquin River water. To the contrary, the Exchange Contractors still own, and on condition may exercise, their senior water rights in the San Joaquin River. *See supra* Part VI.B. By Article 16 of the Exchange Contract, Interior expressly granted the Exchange Contractors a vested priority right to substitute water against all other later-in-time CVP water contractors, which has been recognized in operational practice, legislative history, later contracts, and direct correspondence on the subject to Westlands.

The Bureau holds rights, including riparian and appropriation, to all water in the CVP. It historically contracted with various users for delivery of the majority of this water. The Exchange Contractors are among the first contractors (1939) who *provided* the CVP a conditional water supply, and among the first (1951) to actually *receive* CVP water. The amended Exchange Contract's unambiguous language and the extrinsic evidence prove, by more than a preponderance of the evidence, that the Exchange Contractors have a vested property right to substitute water from the United States from Sacramento River or Delta water, or any other source. This right is *sui generis;* it is a vested first-in-time contractual *priority* right that reserves, for the purpose of establishing relative rights under California water law, the Exchange Contractor's superior status above the plaintiffs as of the date of the original Exchange Contract, July 27, 1939,[46] and the earliest date delivery of

---

46. This does not conflict with California's water-law priorities, because it does not grant

the Exchange Contractors greater priority

appropriated CVP water began under the Exchange Contract, July 16, 1951.

■ In California, appropriation water rights are governed by the principle: "the one first in time is the first in right." *Wishon v. Globe Light & Power Co.*, 158 Cal. 137, 110 P. 290, 292 (1910); *see also City of Barstow v. Mojave Water Agency*, 23 Cal.4th 1224, 99 Cal.Rptr.2d 294, 5 P.3d 853, 863 (2000) ("As between appropriators, however, the one first in time is the first in right, and a prior appropriator is entitled to all the water he needs, up to the amount he has taken in the past, before a subsequent appropriator may take any.") (citation omitted in original). None of the CVP contractors has water rights permits to San Luis Unit water, because they are all secondary to the appropriator of that water, Interior. To the extent plaintiffs and the Exchange Contractors are bound by California water law to determine their priority to San Luis Unit water, under the amended 1939 Exchange Contract, the Exchange Contractors are first-in-time vested water-rights holders from an appropriator. Under California's water-law priority regime, the federal defendants' subsequent contracts for CVP water service to contractors like plaintiffs, Westlands and San Benito, are later-in-time and subordinate to the Exchange Contractors' rights. This determination is reinforced by the language of the contracts and contracting history.

■ For purposes of determining relative priority under California law, as prior contractors (1939) [47] under the Exchange Contract, the Exchange Contractors have superior, not equal, rights over those of the water-districts, who are later (1963 and 1978) secondary customers for CVP water from Interior. The only source of authority to ignore state water law is a preemptive federal statute or clear Congressional directive to the contrary. *See Natural Res. Def. Council,* 146 F.3d at 1132; *S. Delta Water Agency,* 767 F.2d at 538. Plaintiffs do not identify any federal statute granting them priority, nor do they provide evidence that Congress ratified their 1963 or 1978 Contracts, or that either is a Congressional directive. Even if, *arguendo*, plaintiffs' contracts are interpreted, as a matter of law, to require pro-rata distribution of San Luis Unit water, Interior is bound to honor vested priority water rights when performing its water-service contracts. Plaintiffs have provided no evidence or legal authority that supports their claim that their right to San Luis Unit water is superior under California law to the Exchange Contractors' rights. Plaintiffs' position, that they are unaffect-

---

over prior appropriators. *Accord* CAL. WATER CODE § 1475 (West 2000) ("In any case where a reservoir has been or shall hereafter under the provisions of this division be constructed, or surveyed, laid out, and proposed to be constructed, for the storage of water for a system, which water is to be used at one or more points under appropriations of water and rights held and owned by the person owning the reservoir site and constructing the reservoir, the reservoir, appropriations, and rights shall, in the discretion of the board constitute a single enterprise and unit, and work of constructing the reservoir, or work on any one of the appropriations shall, in the discretion of the board, be sufficient to main-

tain and preserve all applications for appropriations and rights thereunder.").

**47.** That the Exchange Contractors have contracted for substitute water from the Bureau as of 1939, long before plaintiffs, makes it unnecessary to decide the open question of California law that troubled the Court of Appeal, whether they remain riparians as to San Luis Water, *i.e.,* whether as riparians before they exchanged (but did not unconditionally transfer and relinquish) the right to exercise their San Joaquin River water rights for a conditional, permanent supply of water, the Exchange Contractors are also considered riparians, for purposes of water-rights priority, with respect to the substitute CVP water.

ed by these priority principles, is untenable. Plaintiffs' motion for summary judgment is DENIED.

## C. *Plaintiffs' Lack of California Water Rights*

After seven years of litigation, plaintiffs have not argued or submitted any evidence that supports a priority in their contracts based on California water-rights law. They have no independent state-law right to San Luis Unit water that is superior to the Exchange Contractors' vested priority rights to that water. They rely only on their contracts.

## CONCLUSION

This litigation exemplifies the axiom that "desperate times call for desperate measures." *E.g.*, Robert G. Bracknell, *All the Laws But One: Civil Liberties in Wartime*, 47 Naval L. Rev. 208, 220 (2000) (reviewing William H. Rehnquist & Alfred A. Knopf, All the Laws But One: Civil Liberties in Wartime (1998)). Plaintiffs are in desperate straits due to the inexorable increase in demands on a limited CVP water supply. They seek to elevate their contract claims as secondary purchasers of federal reclamation water over prior, vested property water-rights holders, the Exchange Contractors. The argument that a last-in-time taker of a benefit can impair the rights of a first-in-time contributor, who made the benefit possible, defies logic and the fifty-year CVP history, with reference to which these disputed contracts were made and performed. Throughout the course of this litigation, plaintiffs have ignored that when the CVP originated, water rights held by the Exchange Contractors were subordinated, *not conveyed,* because they were integral to the existence and operation of the CVP, especially the Friant Division. The Exchange Contractors conditionally agreed to not exercise (*not* to extinguish) their riparian and pre–1914 appropriative rights to San Joaquin

River water, in exchange for a grant from the United States of a conditional, permanent substitute water supply from the CVP or other source selected by the Bureau in its reasonable discretion. The Bureau selected Sacramento River and Delta water as the source for this substitute water. Congress agreed. The Bureau has, by a fifty-year course of dealing, operated the CVP to recognize this source as a vested priority right in the Exchange Contractors. In times of shortage, Article 4 provides the Exchange Contractors priority recourse to San Joaquin River waters. Four independent and severable bases—contract, equitable, and state law—support the Exchange Contractors' priority.

The plain language of plaintiffs' 1963 and 1978 Contracts and substantial extrinsic evidence establish that reducing the Exchange Contractors to pro-rata distribution with plaintiffs was never intended or required. Article 11(a) of the 1963 Contract does not bind other non-parties or require inclusion of the Exchange Contractors' substitute water as part of any pro-rata calculation made under the terms "contractual commitments" or "available supply." The Exchange Contractors' substitute water is not within the meaning of "available water" in Article 7(b) of the 1978 Contract, and the exceptions for "existing contracts" and "undue hardship" also apply. Plaintiffs point to no authority that requires the Bureau to count Sacramento River and Delta water, which is used as substitute water, as part of the available CVP supply, even if it is delivered to the Exchange Contractors through the San Luis Unit.

Second, according to statute and engineering reality, the CVP must be operated as an integrated project. The express, unambiguous terms of Article 4 of the Exchange Contract empower the Exchange Contractors to exercise their reserved San Joaquin River water rights, if

Interior fails to provide them with substitute water. This exercise, however, will significantly interfere with operation of the CVP and cause undue hardship to contractors and the public who rely on municipal and power generation uses from the Friant Division under the Bureau's CVP management. *See, e.g., Westlands III*, 864 F.Supp. at 1549–52 (discussing harmful effects on the Friant Division of the Exchange Contractors' exercise of their San Joaquin River water rights). By contrast, plaintiffs only contributed a then-unapproved application to appropriate water from a San Joaquin River tributary, but no existing water rights that facilitated the creation or operation of the San Luis Unit or the CVP. Plaintiffs have substantially benefitted over the years from government-subsidized water. *See Westlands 2001*, 134 F.Supp.2d at 1141–42 (citing statements of Senator Proxmire; and Congressmen Coelho and Wolpe). Plaintiffs' contract rights are inferior to the Exchange Contractors' water rights. They have no comparable equities. The precise definition under California law of the Exchange Contractors' CVP water rights does not provide priority to plaintiffs' contracts.

Article 11(a) must be interpreted as void to the extent it places plaintiffs on equal priority to CVP water with the Exchange Contractors. A pro-rata interpretation violates the amended Exchange Contract, frustrates basic principles of equity, and impairs the Bureau's ability and statutory duty to operate the CVP as an integrated project. Plaintiffs' interpretation would force the Exchange Contractors to exercise their riparian and pre–1914 appropriative rights to San Joaquin River

water, with a destructive effect that would prevent effective operation of the Friant Division of the CVP, harming not only water-service contractors, but also public non-agricultural water-users served by that water.

To the extent California water law applies to determine water-distribution priority within the CVP, the first-in-time 1939 Exchange Contract grants the Exchange Contractors a priority right to water from the Bureau as of that date. The California water law principle, first in time is first in right, *see, e.g., Wishon*, 110 P. at 292, establishes the Exchange Contractors' senior priority over later CVP water contractors, such as plaintiffs. Relegating the Exchange Contractors to a pro-rata share of San Luis Unit water on the same level with plaintiffs abrogates these senior state-law water rights. There is no clear congressional directive that overcomes the undisputed default rule that the Bureau must operate the CVP, a federal reclamation project, in accordance with California law. Article 11(a) cannot be interpreted to require inclusion of San Luis Unit water, furnished the Exchange Contractors in any year, as "available supply," because such an interpretation would produce a result in conflict with California water law. *See, e.g., Walsh v. Schlecht*, 429 U.S. 401, 408, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977) ("Since a general rule of construction presumes the legality and enforceability of contracts, ambiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable.") (citing 6A CORBIN, CONTRACTS §§ 1499, 1533 (1962)).[48]

---

**48.** *See also Great N. Ry. Co. v. Delmar Co.*, 283 U.S. 686, 690, 51 S.Ct. 579, 75 L.Ed. 1349 (1931) ("where two constructions of a written contract are possible, preference will be given to that which does not result in violation of law.") (citing cases); *United*

*States ex rel. Sharma v. U.S.C.*, 217 F.3d 1141, 1145 (9th Cir.2000) ("As the Ninth Circuit has held, 'ambiguously worded contracts should not be interpreted to render them illegal if a legal construction is plausible.' ") (quoting

Last, plaintiffs have not introduced any evidence or California law that makes their 1963 and 1978 Contracts superior to the first-in-time 1939 Exchange Contract. They have had seven years and full opportunity during the pendency of this case to demonstrate they possess equal water rights under any other theory of contract or state water law. They have not done so. Plaintiffs' contracts do not trump the 1939 Exchange Contract. No pro-rata distribution with plaintiffs of San Luis Unit or other CVP water used by Interior to meet Exchange Contract requirements can be imposed on the Exchange Contractors.

Interior is entitled to provide the Exchange Contractors CVP water on a priority basis over plaintiffs, who have no contract, superior equity, or state-law water rights that take precedence over the Exchange Contractors' senior federal contract vested water rights and reserved state water-law rights. This decision does not address whether the Bureau's overall CVP management has wrongfully deprived plaintiffs of water; only, that taking Sacramento River and Delta (or other CVP) water, delivered through the San Luis Unit, to satisfy the Exchange Contractors' vested property right to substitute water, does not.

Plaintiffs' contracts entitle them to an available pro-rata San Luis Unit water supply, with all other San Luis Unit contractors, only after the Exchange Contractors have received their full substitute water allocation from such source as Interior in its discretion provides, including from the San Luis Unit.

For the reasons stated:

1. Plaintiffs' motion for summary judgment is DENIED.

2. The federal defendants' motion for summary judgment is GRANTED.

3. The Exchange Contractors' and Friant water-users' motions for summary judgment are GRANTED.

4. Judgment SHALL BE ENTERED for the federal defendants and all intervenors against plaintiffs on all claims.

The federal defendants SHALL LODGE, within five (5) days following date of service of this decision, a judgment in conformity with this decision.

SO ORDERED.

### APPENDIX

A. Central Valley Project

B. Central Valley Project—South Half

C. CVP Districts Served With Delta Water

D. Friant Division and Cross Valley Division Districts

E. CVP—West San Joaquin Division

F. CVP—San Luis Unit

G. CVP—Water Districts

*United States v. Sacramento Mun. Util. Dist.,* 652 F.2d 1341, 1346 (9th Cir.1981)); CAL. CIV. CODE § 1643 (West 2000) ("A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."); RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1982) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

## APPENDIX A

CENTRAL VALLEY PROJECT

CALIFORNIA
MID-PACIFIC REGION
MAP NO. 214 208-5123

APPENDIX B

APPENDIX C

# CVP DISTRICTS SERVED WITH DELTA WATER

## APPENDIX D

# FRIANT DIVISION AND CROSS VALLEY DIVISION DISTRICTS

APPENDIX E

APPENDIX F

BUREAU OF RECLAMATION
Central Valley Project
SAN LUIS UNIT

APPENDIX G

